ARTHUR GENSHAFT AND LEONA GENSHAFT, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

DAVID GENSHAFT AND ANNE GENSHAFT, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 9275-72, 9276-72.    Filed May 27, 1975.

*Richard Katcher,* for the petitioners.
*Larry L. Nameroff,* for the respondent.

OPINION

IRWIN, *Judge:* Respondent determined deficiencies in petitioners' income taxes as follows:

| Petitioner | Docket No. | Year | Deficiency |
|---|---|---|---|
| Arthur and Leona Genshaft _____ | 9275-72 | 1968 | $11,084.63 |
| | | 1969 | 12,354.10 |
| David and Anne Genshaft _____ | 9276-72 | 1968 | 6,086.01 |
| | | 1969 | 6,450.96 |

The sole issue presented is whether petitioners received an economic benefit from the maintenance of certain whole life insurance policies by their family-owned corporation under a so-called "split-dollar" arrangement which is taxable under section 61.[1]

All of the facts have been stipulated and are found accordingly.

Petitioners Arthur and Leona Genshaft, husband and wife, and David and Anne Genshaft, husband and wife, all resided in Canton, Ohio, at the time of the filing of their respective petitions with this Court. For the calendar years 1968 and 1969 each couple timely filed joint Federal income tax returns with the Internal Revenue Service Center at Cincinnati, Ohio. Each couple employed the cash receipts and disbursements method of accounting.

At all times pertinent to the resolution of this case, David Genshaft and Arthur Genshaft (hereafter referred to as either petitioners or David and Arthur) were the chief executive officers of Superior's Brand Meats, Inc., formerly known as the Superior Provision Co., an Ohio corporation (hereafter referred to as Superior). Petitioners and their families owned all of the common stock of Superior.

During the years 1957 through 1959 Superior purchased the following life insurance policies from the New York Life Insurance Co. (hereafter referred to as NYLIC):

| Policy No. | Policy date | Face amount | Annual premium [1] | Insured | Age | Beneficiary |
|---|---|---|---|---|---|---|
| 26 182 527 [2] | 9/1/57 | $1,000,000 | $31,800 | Arthur | 43 | Superior |
| 26 364 103 [3] | 2/24/58 | 500,000 | 15,600 | Arthur | 43 | Superior |
| 26 360 279 [4] | 4/18/58 | 300,000 | 8,700 | David | 41 | Superior |
| 26 666 821 [5] | 7/28/57 | 200,000 | 5,800 | David | 41 | Superior |

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

| 26 852 906 [6] | 12/29/59 | 500,000 | 15,600 | David | 43 | Superior |

[1] Premiums are for whole life.

[2] Originally a 5-year term/whole life plan; on June 1, 1958, converted to whole life effective from initial policy date.

[3] Originally a 4-year term/whole life plan; on Mar. 9, 1960, converted to whole life effective from initial policy date.

[4] Originally a 4-year term/whole life plan; on Mar. 9, 1960, converted to whole life effective from initial policy date.

[5] Whole life plan.

[6] Originally a 3-year term/whole life plan; on Mar. 2, 1960, converted to whole life effective from initial policy date.

The five policies contained identical benefits, provisions, conditions, and endorsements. Superior also obtained 1-year-term riders on each policy. These 1-year-term riders provided for nonparticipating term insurance for a period of 1 year beginning on the anniversary date of each policy in an amount equal to the tabular cash value of the policy as of the following anniversary date. Each policy also provided for the application of dividend deposits to cover the term insurance premiums.

In early November, prior to November 13, 1964, Superior executed documents (e.g., "Change of Beneficiary and Ownership," "Settlement Agreement") providing for a modified "split-dollar" arrangement.[2] The specific terms of one of these documents (representative of the documents attached to each

[2] Under the normal "split-dollar" arrangement, the employer and the employee join in purchasing a whole life insurance contract (or a similar type contract containing a substantial investment element) on the life of the employee. The employer agrees to provide the funds to pay the portion of the premium attributable to the annual increase in cash surrender value with the employee paying the balance. In the event of the death of the insured the employer is entitled to receive out of the proceeds of the policy an amount equal to the cash surrender value, or at least a sufficient part thereof to equal the funds it has provided for premium payments. The employee is entitled to name the beneficiary of the balance of any such proceeds. See Rev. Rul. 64-328, 1964-2 C.B. 11. See also Simmons, Federal Taxation of Life Insurance 141-143 (1966). The plan herein differs in that petitioners were not required to pay any portion of the premiums.

Although the documents relating to the "split-dollar" arrangement were dated prior to Nov. 13, 1964, they were not recorded by NYLIC until after Nov. 13, 1964. In this regard we note the following language found in clause 3 of each policy:

Change of Beneficiary

While the Insured is living, the Owner can change the beneficiary from time to time by written notice in form satisfactory to the Company. No such change will take effect unless recorded by the Company at its Home Office. However, upon being so recorded any such change will take effect as of the date the notice was signed, whether or not the Insured is living when the change is recorded, subject to any payment made or other action taken by the Company before such recording.

The pertinence of the Nov. 13, 1967, date is due to the following language in Rev. Rul. 64-328, 1964-2 C.B. 11, 15:

In view of the foregoing, Revenue Ruling 55-713, C.B. 1955-2, 23, is revoked. The revocation is effective as to policies purchased under "split dollar" arrangements or utilized to establish such arrangements after November 13, 1964.

policy) are set forth in the margin.[3]

Superior borrowed extensively on the cash values of each of the policies. For the year 1966 the following chart (derived from tables prepared by NYLIC)[4] indicates relevant data with respect to each policy:

---

[3] CHANGE OF BENEFICIARY AND OWNERSHIP

To be attached to Policy Number 26 182 527 on the life of ARTHUR GENSHAFT

1. The "Beneficiary" is hereby changed as follows:

(A) SUPERIOR'S BRAND MEATS, INC., to the extent of an amount equal to the sum of (1) the tabular cash value as of the date to which premiums have fallen due and been paid at the time of the insured's death determined in accordance with the Table of Cash, Loan and Non-forfeiture Values herein, less any indebtedness, provided however, the interest of this beneficiary hereunder, shall be decreased by the amount of the increase in the tabular cash value during the period for which premiums were waived under any Waiver of Premium Benefit Provisions, plus

(2) Any dividend deposits outstanding at the time of the insured's death exclusive of any interest credited on such dividend deposits since the preceding anniversary, and

(B) LEONA GENSHAFT, wife of the insured, or in the event of her death to Judy and Neil Genshaft, children of the insured, share alike or to the survivor or if there be no survivor to the executors or administrators of the beneficiary last to die. To the extent of any death benefit proceeds remaining after payment of the amount stipulated in (A) above. Notwithstanding anything in this policy to the contrary, this portion of the designation of beneficiary may not be changed without the written consent of Leona Genshaft during her lifetime or in the event of her death without the written consent of the living persons so designated.

2. It is further provided that subject to the Modification of Owner's Rights, assignment and Dividend Provisions hereinafter requested or confirmed, the owner will be SUPERIOR'S BRAND MEATS, INC.

3. That said policy be indorsed with the following provision:

MODIFICATION OF OWNER'S RIGHTS, ASSIGNMENT AND DIVIDEND PROVISIONS

In accordance with the Owner's written request, and notwithstanding anything in this policy to the contrary, the owner may not change the Dividend Deposit Option, nor request termination of the provision to apply outstanding dividend deposits to provide one year term insurance under the Provisions for application of Dividend Deposits to provide one year term insurance, nor may the owner make any withdrawal of Dividends on Deposit, and the assignment provisions of the policy are hereby modified to provide that the interest of any beneficiary named in part (B) of the beneficiary designation under this policy shall not be subordinate to the interest of any assignee nor may such interest be assigned by the owner, and any assignment of this policy, or of any interest therein, shall not be deemed to constitute a change of part (B) of the beneficiary designation thereof. In all other respects, the ownership of policy provisions of this policy will apply.

Dated 11/6/64                                    SUPERIOR'S BRAND MEATS, INC.
                                                 BY: [Signed] David Genshaft, V. President
                                                 Policy owner
                                                 I hereby consent to this change
                                                 [Signed] Arthur Genshaft
                                                 Insured

[4] We have adopted NYLIC's figures without regard to their mathematical accuracy. We note, for example, that the amount in line 4 of column (h) should be $2,156.27, not $2,156.24.

| Policy No. | (a) Face amount | Valuation date[1] | (b) Cash value subject to deduction of indebtedness[2] | (c) Dividends outstanding |
|---|---|---|---|---|
| 26 182 527 | $1,000,000 | 9/1/66 | $213,026.79 | $13,026.79 |
| 26 364 103 | 500,000 | 2/24/66 | 91,965.00 | 3,465.00 |
| 26 360 279 | 300,000 | 4/18/66 | 52,437.00 | 2,037.00 |
| 26 666 821 | 200,000 | 7/28/66 | 40,285.82 | 2,485.82 |
| 26 852 906 | 500,000 | 12/29/66 | 83,217.57 | 5,717.57 |

| Policy No. | (d) Indebtedness | | (e) Net cash and loan value[3] | (f) 1-year term insurance |
|---|---|---|---|---|
| | Loan | Interest | | |
| 26 182 527 | $198,459 | $6,688.07 | $7,879.72 | $223,000 |
| 26 364 103 | 87,784 | 685.15 | 3,495.85 | 100,000 |
| 26 360 279 | 49,626 | 747.78 | 2,063.22 | 56,700 |
| 26 666 821 | 37,719 | 1,090.27 | 1,476.55 | 42,200 |
| 26 852 906 | 75,846 | 3,792.30 | 3,579.21 | 88,500 |

| Policy No. | (g) Term premium[4] | (h) Net dividends[5] | (i) Gross death benefit[6] |
|---|---|---|---|
| 26 182 527 | $2,091.74 | $10,935.05 | $1,233,935.05 |
| 26 364 103 | 856.00 | 2,609.00 | 602,609.00 |
| 26 360 279 | 403.70 | 1,633.30 | 358,333.30 |
| 26 666 821 | 329.55 | 2,156.24 | 244,356.24 |
| 26 852 906 | 691.19 | 5,026.38 | 593,526.38 |

| Policy No. | (j) Net death benefit[7] | (k) Amount payable[8] | |
|---|---|---|---|
| | | Superior | Insured's beneficiary |
| 26 182 527 | $1,028,787.98 | $7,660.93 | $1,021,127.05 |
| 26 364 103 | 514,139.85 | 36,330.85 | 477,809.00 |
| 26 360 279 | 307,959.52 | 1,659.52 | 306,300.00 |
| 26 666 821 | 205,546.97 | 1,104.01 | 204,442.96 |
| 26 852 906 | 513,888.08 | 29,561.70 | 484,326.38 |

[1] Anniversary date of each policy.
[2] Includes dividends outstanding.
[3] (b) minus (d).
[4] Paid out of dividends.
[5] (c) minus (g).
[6] (a) plus (f) plus (h).
[7] (i) minus (d).
[8] Pursuant to "split-dollar" arrangement.

During 1966, Superior executed documents terminating the five policies and concurrently causing new modified 5-year term/whole life policies to be issued.[5] The specific terms of one of these documents (representative of the documents attached to each policy) are set forth in the margin.[6] These new policies were

[5] In this regard we note the following language found in clause 9 of each policy:

9. Change of Policy with Company's Approval
Subject to the Company's approval and such requirements and payment, if any, as the Company shall determine, the Owner may exchange this policy for a corresponding policy on another plan of insurance or a policy of lesser amount.

[6] Policy 26 182 527 Insured Arthur Genshaft
It is hereby requested that the above numbered policy be changed to: [sic] terminated and exchanged concurrently for a new $1,000,000. Modified Five Year Term-Whole Life Policy effective as of September 1, 1966 at age 52, with the Waiver of Premium Benefit and One Year Term Rider and without the Double Indemnity Benefit. The policy is to

subsequently converted into whole life policies, effective from the initial policy date. Relevant data with respect to each new policy is set forth in the following chart:

| New policy No. | (Old policy No.) | Policy date | Face amount | Annual premium [1] |
|---|---|---|---|---|
| 31 117 049 | (26 182 527) | 9/1/66 | $1,000,000 | [2] $45,110 |
| 30 977 215 | (26 364 103) | 2/24/66 | 500,000 | 20,500 |
| 31 117 075 | (26 360 279) | 7/28/66 | 300,000 | [3] 12,375 |
| 31 117 074 | (26 666 821) | 7/28/66 | 200,000 | [4] 8,250 |
| 31 207 339 | (26 852 906) | 12/29/66 | 500,000 | 19,675 |

| New policy No. | (Old policy No.) | Insured | Age | Beneficiary [5] |
|---|---|---|---|---|
| 31 117 049 | (26 182 527) | Arthur | 52 | Superior/ insured's beneficiary |
| 30 977 215 | (26 364 103) | Arthur | 51 | Superior/ insured's beneficiary |
| 31 117 075 | (26 360 279) | David | 50 | Superior/ insured's beneficiary |
| 31 117 074 | (26 666 821) | David | 50 | Superior/ insured's beneficiary |
| 31 207 339 | (26 852 906) | David | 50 | Superior/ insured's beneficiary |

[1] Premiums are for whole life; based on insured's age in 1966.
[2] Includes $2,370 for "waiver of premium benefit"; payable for 8 years.
[3] Includes $570 for "waiver of premium benefit"; payable for 10 years.
[4] Includes $380 for "waiver of premium benefit"; payable for 10 years.
[5] Determined according to "split-dollar" arrangement of old policies.

When each of the old policies was terminated the cash value was applied against Superior's outstanding indebtedness to NYLIC thereby canceling in full such indebtedness. The balance of the cash value of each old policy was then applied as part payment on the first annual premium due on each related new policy.

Except for the higher premiums (due to the fact that the premiums were determined according to the insured's age as of the new policy date of each policy rather than with respect to the original policy date of each old policy), the provisions of each new policy were identical to the provisions of each related old policy. Documents relating to the "split-dollar" arrangement attached to the old policies were attached to the new policies. When Superior obtained the new policies, NYLIC did not subject petitioners to new medical examinations. Nor did NYLIC reactivate the 1-year contestable and suicide periods. However, NYLIC did pay policy commissions on the issuance of the new policies.

contain the Automatic Premium Loan Option.
Date 8/24/66       Superiors Brand Meats, Inc.
      [Signed] David Genshaft
      Person with the right to change policy
      [Signed] Anne Genshaft

[Attached to policy No. 31 117 049.]

288

For the years 1967, 1968, and 1969, the following chart (also derived from tables prepared by NYLIC) [7] indicates further relevant data with respect to each new policy:

| Policy No. | (a) Face amount | Valuation date [1] | (b) Cash value subject to deduction of indebtedness [2] | (c) Dividends outstanding |
|---|---|---|---|---|
| 31 117 049 | $1,000,000 | 9/1/'67 | $9,000.00 | 0 |
|  |  | 9/1/68 | 43,470.00 | $4,470.00 |
|  |  | 9/1/69 | 79,549.19 | 9,549.19 |
| 30 977 215 | 500,000 | 2/24/67 | 4,000.00 | 0 |
|  |  | 2/24/68 | 21,110.00 | 2,110.00 |
|  |  | 2/24/69 | 38,046.67 | 4,546.67 |
| 31 117 075 | 300,000 | 7/28/67 | 2,100.00 | 0 |
|  |  | 7/28/68 | 11,991.00 | 1,191.00 |
|  |  | 7/28/69 | 22,090.76 | 2,590.76 |
| 31 117 074 | 200,000 | 7/28/67 | 1,400.00 | 0 |
|  |  | 7/28/68 | 7,994.00 | 794.00 |
|  |  | 7/28/69 | 14,727.18 | 1,727.18 |
| 31 207 339 | 500,000 | 12/29/67 | 3,500.00 | 0 |
|  |  | 12/29/68 | 19,985.00 | 1,985.00 |
|  |  | 12/29/69 | 35,070.00 | 2,570.00 |

| Policy No. | (d) Indebtedness Loan | Interest | (e) Net cash and loan value [3] | (f) 1-year term insurance |
|---|---|---|---|---|
| 31 117 049 | $8,738.00 | $209.47 | $52.53 | 0 |
|  | 38,117.07 | 798.88 | 4,554.05 | $70,000 |
|  | 72,049.93 | 1,510.06 | 5,989.20 | 101,000 |
| 30 977 215 | 0 | 0 | 4,000.00 | 0 |
|  | 18,460.99 | 490.60 | 2,158.41 | 33,500 |
|  | 33,493.60 | 1,532.43 | 3,020.64 | 49,000 |
| 31 117 075 | 2,047.50 | 41.23 | 11.27 | 0 |
|  | 10,591.08 | 132.02 | 1,267.90 | 19,500 |
|  | 20,079.64 | 412.60 | 1,598.52 | 28,500 |
| 31 117 074 | 1,365.02 | 27.49 | 7.49 | 0 |
|  | 7,039.95 | 87.76 | 866.29 | 13,000 |
|  | 13,386.42 | 275.06 | 1,065.70 | 19,000 |
| 31 207 339 | 3,412.51 | 64.04 | 23.45 | 0 |
|  | 17,319.76 | 578.91 | 2,086.33 | 32,500 |
|  | 30,924.36 | 1,414.90 | 2,730.74 | 47,500 |

| Policy No. | (g) Term premium [4] | (h) Net dividend [5] | (i) Gross death benefit [6] | (j) Net death benefit [7] |
|---|---|---|---|---|
| 31 117 049 | 0 | 0 | $1,000,000.00 | $991,052.53 |
|  | $805.70 | $3,664.30 | 1,073,664.30 | 1,034,748.35 |
|  | 1,271.59 | 8,277.60 | 1,109,277.60 | 1,035,717.61 |
| 30 977 215 | 0 | 0 | 500,000.00 | 500,000.00 |
|  | 352.42 | 1,757.58 | 535,257.58 | 516,305.99 |
|  | 563.99 | 3,982.68 | 552,982.68 | 517,956.65 |
| 31 117 075 | 0 | 0 | 300,000.00 | 297,941.23 |
|  | 187.40 | 1,003.60 | 320,503.60 | 309,780.50 |
|  | 299.82 | 2,290.94 | 330,790.94 | 310,298.70 |
| 31 117 074 | 0 | 0 | 200,000.00 | 198,607.49 |
|  | 124.93 | 669.07 | 213,669.07 | 206,541.36 |
|  | 199.88 | 1,527.30 | 220,527.30 | 206,865.82 |
| 31 207 339 | 0 | 0 | 500,000.00 | 496,523.45 |
|  | 312.33 | [8] 1,672.67 | 534,172.67 | 516,274.00 |
|  | 499.70 | 2,070.30 | 549,570.30 | 517,231.04 |

---

[7] As noted previously, we have adopted NYLIC's figures without regard to their mathematical accuracy. We note, for example, that the amount in line 7 of column (j) should be $297,911.27, not $297,941.23. This error resulted in subtracting only $11.27 of interest on the outstanding indebtedness rather than $41.23. Consequently, the remaining amounts in that column are subject to that same disparity.

| | (k) | |
| | Amount payable[9] | |
| Policy No. | Superior | Insured's beneficiary |
|---|---|---|
| 31 117 049 | $52.53 | $991,000.00 |
| | 4,554.05 | 1,030,194.30 |
| | 5,824.31 | 1,029,893.30 |
| 30 977 215 | 20,600.00 | 479,400.00 |
| | 22,248.41 | 494,057.58 |
| | 26,773.97 | 491,182.68 |
| 31 117 075 | 11.27 | 297,929.96 |
| | 1,080.50 | 308,700.00 |
| | 1,253.54 | 309,045.00 |
| 31 117 074 | 7.49 | 198,600.00 |
| | 866.29 | 205,675.07 |
| | 1,035.59 | 205,830.23 |
| 31 207 339 | 16,298.45 | 480,225.00 |
| | 21,651.33 | 494,622.67 |
| | 26,985.74 | 490,245.30 |

---

[1] Anniversary date of each policy.
[2] Includes dividends outstanding.
[3] (b) minus (d).
[4] Paid out of dividends.
[5] (c) minus (g).
[6] (a) plus (f) plus (h).
[7] (i) minus (d).
[8] This dividend was withdrawn in its entirety: $994 on 12/24/68 and $678.67 on 1/15/69.
[9] Pursuant to "split-dollar" arrangement.

Petitioners were not required to, and did not, pay any portion of the premiums on any of the policies. They also did not report any income with respect to the benefit conferred on them by the policies.

Respondent determined that Arthur received additional income during 1968 and 1969 in the respective amounts of $17,525.21 and $18,861.10 resulting from the economic benefit conferred by the two policies insuring his life. Respondent also determined that David received additional income during 1968 and 1969 in the respective amounts of $10,293.46 and $11,094.54 resulting from the economic benefit conferred by the three policies insuring his life. Respondent's "Explanation of Adjustment" for Arthur is set forth in the margin.[8] Except for the amounts, the explanation attached to David's notice of deficiency is substantially the same.

---

[8] EXPLANATION OF ADJUSTMENT

(a) You received economic benefits having a value of $17,525.21 in 1968 and $18,861.10 in 1969 as determined under the provisions of Revenue Ruling 64-328, CB 1964-2, 11 in the form of the annual cost of premiums you would have been required to pay to acquire your beneficial interest in two life insurance policies purchased by your employer in 1966 under a split-dollar arrangement with the employer assuming the cost of premiums for both your and its beneficial interest in the contracts. It is held that the value of the economic benefits received is includable in your taxable income in the amounts and years stated under the provisions of Section 61 of the Internal Revenue Code.

Petitioners submit that respondent erred in increasing their respective taxable incomes during the years in issue. Their argument is two-pronged: First, they contend that they escape taxation by reason of Rev. Rul. 55-713, 1955-2 C.B. 23, Rev. Rul. 64-328, 1964-2 C.B. 11, not being applicable because its revocation of Rev. Rul. 55-713 is effective only "as to policies purchased under 'split-dollar' arrangements or utilized to establish such arrangements after November 13, 1964." It is their position that the policies in effect during the years in issue were not "purchased" after November 13, 1964, but were issued in "exchange" for the related old policies which contained identical provisions, including provisions providing for "split-dollar" arrangements which were in effect prior to November 14, 1964, and that, therefore, Rev. Rul. 55-713 is still applicable as to the "exchanged" policies. Secondly, they contend that even if they fall within Rev. Rul. 64-328, that ruling should not be followed because it is contra to our decision in *J. Simpson Dean*, 35 T.C. 1083 (1961). For reasons to be stated hereafter, it is our judgment that each petitioner's gross income should be increased to reflect the benefit conferred on them by the maintenance of the policies by Superior.

Basically, we are called upon to determine the tax effect on petitioners resulting from the maintenance of five so-called "split-dollar" insurance policies by their employer. In answering this question we need not initially concern ourselves with either Rev. Rul. 55-713 or Rev. Rul. 64-328.

It is well settled that gross income (as defined in section 61) includes the value of any economic benefit conferred on an employee by his employer. See, e.g., *Commissioner v. Smith*, 324 U.S. 177, 181 (1945). The regulations under section 61 specifically provide that life insurance premiums paid by an employer on the life of his employee are includable in the employee's gross income where the proceeds of such insurance are payable to a beneficiary named by the employee. Sec. 1.61-2(d)(2)(ii)(a), Income Tax Regs. It follows, therefore, that each petitioner received a present economic benefit from the payment of the premiums by Superior to the extent of the insurance protection provided to each petitioner's beneficiary during the years in issue. See *Paul L. Frost*, 52 T.C. 89, 96 (1969). Compare *William C. Wright*, 62 T.C. 377 (1974). Contrary to petitioners' contention Rev. Rul. 55-713 does not provide for nontaxability in

the instant situation. This ruling, in substance, only provides that the portion of insurance premiums paid by an employer in a typical "split-dollar" arrangement do not constitute additional income to the employee to the extent of the increase in the cash surrender value. In the case at bar we are not concerned, as such, with the investment element of the policies; it is the pure insurance element of the policies and its economic benefit to petitioners that is at issue. Similarly, *J. Simpson Dean, supra,* is not in point.[9] We are not dealing with employer-employee interest-free loans. The loan analogy in Rev. Rul. 55-713 relates only to the portion of the premiums paid relating to the increase in the cash surrender value; the analogy does not relate to the insurance element of the policy.

Having determined that petitioners received a present economic benefit during each of the years in issue, the only question left is the method of valuing that benefit. It is this question that brings into consideration Rev. Ruls. 55-713 and 64-328.

We note first of all that neither Rev. Rul. 64-328 nor Rev. Rul. 55-713 is directly in point. Each ruling presumes that the employer will pay only the portion of the premium equal to the increase in cash surrender value of the policy with the employee paying the balance, if any, of the premiums due. In the instant situation petitioners were not required to pay any portion of the premiums. However, we believe the instant situation still falls within the ambit of the two rulings. We want to emphasize, though, that revenue rulings are advisory only; they do not carry the force of law nor bind this Court in any manner. *Ronald C. Packard,* 63 T.C. 621, 637 (1975); *G. Douglas Burck,* 63 T.C. 556, 561-562 (1975); *Andrew A. Sandor,* 62 T.C. 469, 481-482 (1974).[10]

---

[9] In *J. Simpson Dean* we held, inter alia, that interest-free loans by a corporation to its controlling shareholders did not result in taxable income to the extent of the benefit conferred. We see no need to reconsider that issue in this instance.

[10] In this regard we note particularly the language in *Andrew A. Sandor, supra* at 481-482:

"The purpose of the publication of revenue rulings is to publish the official interpretation of the Revenue Service of certain laws as applied to certain circumstances in order to promote uniform application of the tax laws by Service employees and to advise taxpayers of the official Service position. They do not have the force and effect of Treasury Department Regulations but are published to provide precedents to be used in the disposition of other cases. They are not binding on the courts. See Statement of Principles of Internal Revenue Tax Administration in current Internal Revenue Bulletins; *United States* v. *Hall,* 398 F. 2d 383 (C.A. 8, 1968); *Stubbs, Overbeck & Associates* v. *United*

Bearing the above in mind, we turn to the two rulings. Respondent argues that Rev. Rul. 64-328 should be employed to determine the value of the economic benefit conferred. Petitioners, on the other hand, submit that Rev. Rul. 64-328's grandfather clause prevents its applicability; and that, therefore, respondent must be bound by his position as set forth in Rev. Rul. 55-713.[11] We glean from Rev. Rul. 55-713 that respondent would determine the value of the annual economic benefit conferred by subtracting the increase in the cash surrender value from the total premium due (including the 1-year term insurance premiums).[12] The basis of this method rests with Rev. Rul. 55-713's analysis that the substance of a "split-dollar" arrangement is essentially the same as if the employer had made annual interest-free loans to the employee equal to the increase in the cash surrender value.

In Rev. Rul. 64-328 respondent revoked Rev. Rul. 55-713, stating that Rev. Rul. 55-713 incorrectly analyzed the situation. The ruling went on to provide that the value of the economic benefit conferred is to be determined by computing the annual cost of pure term insurance for the amount payable to the employee's beneficiary less any amounts of the total premium paid by the employee. However, as we have noted previously, Rev. Rul. 64-328 provides that Rev. Rul. 55-713 will still be applicable to "split-dollar" policies in effect prior to November 14, 1964.

In our judgment, the policies in effect during the years in issue were in substance mere continuations of the related old policies and thus not "purchased" after November 13, 1964. Therefore, they fall within the purview of Rev. Rul. 55-713 and not Rev. Rul. 64-328. These were not the independent purchase of new policies but were clearly dependent upon the old policies. Each new policy contained substantially the same provisions as the old. The face amounts were the same and the "split-dollar" provisions of the old policies were attached to the new. We also note that petitioners were not subjected to new medical examinations and that the 1-year contestable and suicide periods were not

---

*States,* 445 F. 2d 1142 (C.A. 5, 1971)."

[11] Although petitioners have misinterpreted Rev. Rul. 55-713, their basic argument to its applicability is valid.

[12] On brief respondent argues that this is the proper method of valuation if we determine that Rev. Rul. 64-328 is not applicable.

reactivated. The only material difference, as far as we can determine, is the higher premiums. The premiums were determined with respect to each insured's age as of the date of each new policy and not as of the date of each original policy. We do not find this to be a significant difference in determining whether or not the policies were purchased or utilized to establish "split-dollar" arrangements after November 13, 1964.

Respondent also places much emphasis upon the numerical differences in the benefits payable to Superior and to petitioners' beneficiaries. We do not find this to be a material difference. The split up of the death proceeds was to be determined in the identical manner. The total net death benefit, as noted in our findings, depended not only upon the face amount of each policy, but also upon the amount of any 1-year term insurance and upon any indebtedness. The numerical amounts of the net benefits were changing each year. However, the method of computation remained the same. Had there been a significant and material change in any of the policies, then it would appear clear that the policies would fall within the ambit of Rev. Rul. 64-328 for purposes of determining the value of the economic benefit conferred, but such was not the case in this instance.[13]

Consequently, it is our decision that the value of the economic benefit conferred shall be determined in accordance with our interpretation of Rev. Rul. 55-713. Petitioners have not, as such, questioned the method of valuation. Their arguments were directed toward complete immunity from taxation. We need not, and do not, consider the validity of Rev. Rul. 64-328.

*Decisions will be entered under Rule 155.*

---

[13] Although we have ruled against respondent on this point, we want to make it clear that this finding, as we view it, was entirely factual. Petitioners' reliance on *Aetna Life Ins. Co. v. Dunken,* 266 U.S. 389 (1924), is misplaced. In that case the new policy therein resulted from a conversion, the terms of which were provided in the original policy; in the instant situation there was no conversion. Although the old policies were terminated, we have found the new policies to be more in the nature of replacements rather than as "purchases," as that term is employed in the ruling.