HOWARD JOHNSON AND NOBIA F. JOHNSON, PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2393–78.     Filed September 17, 1980.

---

*John L. Johnson,* for the petitioners.
*Michael W. Bentley,* for the respondent.

IRWIN, *Judge:* By letter dated December 13, 1977, respondent determined deficiencies in petitioners' 1974 and 1975 income taxes of $1,237 and $3,005, respectively. The only issue for our decision is whether payments of premiums on certain policies insuring the life of petitioner, Howard Johnson, by a corporation in which petitioners are shareholders, constitute income to petitioners.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Petitioners Howard and Nobia F. Johnson resided in Clinton, Ark., when they filed their petition herein. Petitioners timely filed their joint Federal income tax returns for the taxable years 1974 and 1975 with the Internal Revenue Service Center in Austin, Tex.

During 1973 through 1975, petitioner Howard Johnson (hereafter sometimes referred to as Howard) was employed as the president of the Clinton State Bank (CSB), an Arkansas corporation with its principal place of business in Clinton, Ark.

During 1973 through 1975, petitioners individually owned 1,240 of the 4,000 outstanding shares of stock of CSB. John L. Johnson (John), petitioners' son, owned 340 shares of CSB stock. Petitioner Nobia F. Johnson (Nobia) was the trustee of the Mark Allen Johnson Trust and the Angela Clare Johnson Trust. Each of these trusts owned 200 shares of CSB's stock during the years 1973 through 1975, inclusive. Mark Allen Johnson and Angela Clare Johnson are John's children and petitioners' grandchildren.

During 1973 through 1975, Howard was chairman of the board of CSB, in addition to being president of CSB. The board of directors of CSB during those years was composed of the following individuals: Howard, Nobia, John, Roy Lefler, Jr., W. H. Ham, Homer Brown, Arthur Lewis, Dickie V. Lefler, and Garner M. Johnson. John also served as CSB's tax and legal counsel, for which John received no retainer.

On April 1, 1970, a document entitled "Howard Johnson

Insurance Trust" was executed. Nobia was the grantor and John the trustee of the Howard Johnson Insurance Trust (hereafter sometimes referred to as the trust). The trust was initially funded with six insurance policies on Howard's life.[1] The trust document contained a provision for the possibility of subsequent transfers, by Nobia, of two other existing policies on Howard's life, to be administered in accordance with the trust's terms.

The trust provided for collection of the six policies' proceeds upon Howard's death and investment of such proceeds in real and personal property. The net income from the proceeds was to be paid (at least annually) successively to Nobia, John, and Rebecca Johnson (John's wife) for each of their lives. The remaining net income from the trust was payable to John, for his life, and then to Nobia's grandchildren in equal shares.[2] The trust was to be terminated upon the closing of the administration of the estate of the survivor of Nobia, Howard, John, and John's surviving spouse and the corpus paid to or for the benefit of Nobia's grandchildren in such proportion as John may specify in his will. The trust was irrevocable and gave John the right, as trustee, to exercise the "incidents of ownership" over the various policies.

Petitioners have made numerous other gifts to their grandchildren.

At some time after the execution of the Howard Johnson Insurance Trust, John discussed with Jerry B. Prewit (Prewit) of Connecticut General Life Insurance Co. (Connecticut General) the possibility of obtaining insurance on John's life. Because John was medically uninsurable, he and Prewit decided to obtain additional insurance on Howard's life.

On October 10, 1973, John presented the idea of a "split-dollar" life insurance arrangement to the CSB board of directors. Under John's proposal, CSB would pay the entire annual premium on a $100,000 policy insuring Howard's life. Upon Howard's death, CSB would collect an amount equal to the net cash value of the policy as of the date to which premiums have been paid. CSB was the proposed policy assignee. The excess of

---

[1] These six policies were originally owned by Howard. The record is silent as to the interval between Howard's transfer of the policies to Nobia and Nobia's creation of the trust.

[2] Apparently, this provision was intended to cover the proceeds from policies, other than the six original policies, subsequently transferred into the trust.

the policy proceeds was to be paid to the designee of the trustee (John) of the Howard Johnson Insurance Trust. John advised the board that the proposal was made to provide a benefit to his (John's) children. On October 10, 1973, the entire board of directors of CSB unanimously passed the following resolution:

John L. Johnson made a report to the meeting on the desirability of establishing a "split-dollar" plan with respect to one of its officers. After discussion, motion was duly made and seconded that the following resolution be passed:

RESOLVED, that the officers of this corporation are authorized to procure a policy of life insurance on the life of Howard Johnson in the amount of $100,000 on the "Split-Dollar" plan, of which this corporation shall be the assignee but under which the Trustee of the Howard Johnson Insurance Trust dated April 1, 1970, shall have the right to designate the payee and manner of payment of any proceeds payable by reason of his death, which are in excess of the Net Cash Value of the policy as of the date to which premiums have been paid.

The Treasurer is authorized to pay the full premiums of $6,495 on the policy.

When the board meeting ended, Howard completed an application for Connecticut General whole life insurance policy number 1500052. Howard was 61 years old on the date of issue, which was stated to be October 1, 1973.

On November 13, 1974, John made an identical split-dollar insurance proposal to the board. Again, the entire board unanimously passed a resolution favoring John's proposal. The resolution passed was as follows:

John L. Johnson made a report to the meeting on the desirability of establishing a "Split-Dollar" plan with respect to one of its officers. After discussion, motion was duly made and seconded that the following resolution be passed:

RESOLVED, that the officers of this corporation are authorized to procure a policy of life insurance on the life of Howard Johnson in the amount of $100,000 on the "Split-Dollar" plan, of which this corporation shall be the assignee but under which the Trustee of the Howard Johnson Insurance Trust dated April 1, 1970, shall have the right to designate the payee and manner of payment of any proceeds payable by reason of his death, which are in excess of the Net Cash Value of the policy as of the date to which premiums have been paid.

The Treasurer is authorized to pay the full premiums of $6,877 on the policy.

After the board meeting, Howard completed an application for Connecticut General whole life insurance policy number 1579273.

On November 10, 1974, the date the policy was issued, Howard was 62 years old.

During 1974 and 1975, CSB paid all premiums on Connecticut General policies numbers 1500052 and 1579273. These premium payments were as follows:

| Policy number | 1974 | 1975 |
|---|---|---|
| 1500052 | [3]$6505 | $6505 |
| 1579273 | 6877 | 6877 |

During 1974 and 1975, dividends accrued on the policies as follows:

| Policy number | 1974 | 1975 |
|---|---|---|
| 1500052 | $675 | $675 |
| 1579273 | 0 | 718 |

A portion of the accrued dividends was used to purchase additional 1 year term life insurance coverage on Howard's life. The beneficiary of this additional coverage was the trustee of the Howard Johnson Insurance Trust. The amount of accrued dividends used for this purpose was as follows:

| Policy number | 1974 | 1975 |
|---|---|---|
| 1500052 | $137.92 | $239.11 |
| 1579273 | 0 | 153.34 |

During 1974 and 1975, the cash value of the policies was as follows:

| Policy number | 1974 | 1975 |
|---|---|---|
| 1500052 | $2300 | $5800 |
| 1579273 | 0 | 2400 |

CSB was the owner of each policy and John, as trustee of the trust, was the subowner and beneficiary of each policy.

Petitioners reported no income from the payments of the premiums by CSB. Respondent determined that petitioners received dividends of $2,531.57 and $5,500.09 in 1974 and 1975, respectively, from CSB's premium payments.[4]

---

[3]Although the board resolution stated that the annual premium for this policy was $6495, the actual premium was $6505.

[4]The parties agree that if petitioners received dividends from such payments, then respondent's calculations are correct.

## OPINION

The issue for our decision is whether petitioner realized income from the payment of premiums for "split-dollar" life insurance policies covering the life of petitioner Howard Johnson by a bank in which petitioners were shareholders. Respondent also contends that the premium payments may have been additional compensation to petitioner Howard Johnson. Petitioners argue that the policies purchased by CSB were intended by CSB to compensate petitioners' son, and that even if the policies were intended as dividends or compensation to petitioners, then petitioners realized no income from the premium payments because petitioners derived no "economic benefit" therefrom.

We must first dispose of petitioners' first contention: that respondent has attempted to tax the wrong person. If we should find that the premium payments were income to John, then we must hold for petitioners.

Petitioners readily admit that the purchase of the policies was a bad investment on the part of CSB. The cash value of each policy, which was the portion of each policy payable to CSB, was well below the premium paid by CSB. Petitioners maintain that the economic benefits of CSB's premium payments were conferred solely upon John and his children, who were beneficiaries of the trust, and not upon petitioners. We disagree.

First, the resolutions of CSB's board of directors approving purchase of the policies were silent upon the question of whether the policies were intended for the benefit of Howard, or John and John's children. While John represented to the board that the policies were intended to provide a benefit for him and his children, the approving resolution did not reflect these representations. Certainly, it would have been a simple matter to include the reasons motivating the purchases of the policies into the corporate resolutions approving such purchases. While petitioners argue that John was undercompensated for his services as counsel to CSB, they have not shown the extent of such services or John's compensation.

Second, petitioners have overlooked the fact that the policies were payable to the Howard Johnson Insurance Trust, a trust previously established to benefit several persons, including Nobia, upon Howard's death. The record shows that petitioners bestowed a number of gifts, including the original policies put into the Howard Johnson Insurance Trust, on their grandchil-

dren. While the policies benefit John's family, they also neatly fit into a pattern of tax planning intended to provide for petitioners' son, daughter-in-law, and grandchildren. Under these circumstances, we find that the policies were not intended as compensation for John.

Petitioners' second contention is that the policies conferred no economic benefit upon petitioners, and thus, payment of premiums thereupon cannot constitute income. Petitioners base this argument primarily upon the ownership of the policies. Petitioners maintain that because CSB was the owner of the policies and the subowner and beneficiary of the policies was John, a trustee, petitioners did not control the "risk element" of the split-dollar policies and thus did not possess any incidents of ownership with respect to the policies.

Petitioners' contention is wide of the mark. In the typical split-dollar arrangement, an employer and employee jointly purchase an insurance contract, in which there is a substantial investment element, on the life of the employee. Normally, the employer pays that portion of the annual premium which equals the increase in the policy's cash surrender value for that year, and the employee pays the balance of the premium. The employer is entitled to receive, out of the policy proceeds, an amount equal to the cash surrender value or at least an amount equal to its premium payments, i.e., the "investment element." The employee's beneficiary is entitled to receive the balance of the proceeds, or the "risk element." See Rev. Rul. 64–328, 1964–2 C.B. 11.

In Rev. Rul. 55–713, 1955–2 C.B. 23, respondent ruled that the typical split-dollar arrangement did not result in income to the employee, likening the employer's payments to interest-free loans to the employee. Rev. Rul. 55–713 was revoked by Rev. Rul. 64–328, *supra,* in which respondent ruled that the "interest-free loan" analysis of Rev. Rul. 55–713 was faulty. Because a typical policy's cash surrender value increases rapidly over time, the employee's portion of the annual premium decreases. Thus, the employee in effect receives an economic benefit "represented by the amount of the annual premium cost that he should bear and of which he is relieved." 1964–2 C.B. at 13.

In *Genshaft v. Commissioner,* 64 T.C. 282 (1975), petitioners and their families owned all of the stock of Superior. Superior purchased a number of split-dollar policies on petitioners' lives.

Petitioners were not required to, and did not, pay any portion of the premium on any of the policies. We held that petitioners received an economic benefit from the "insurance portion" of the policies, i.e., that portion of the policy proceeds not payable to the employer. Our holding was not based on Rev. Rul. 55–713 or Rev. Rul. 64–328, but rather on general principles of taxation. We see no reason why our holding in *Genshaft* should not apply in the corporation-shareholder context as well as the employer-employee context.[5] Petitioners herein received an economic benefit from CSB's payment of the entire premium for the split-dollar policies.

Nor do we believe that the fact that the policies' proceeds were payable to an irrevocable trust should change our holding. Taxes are often imposed without requiring actual receipt by the taxpayer of the income being taxed. For example, in *Epstein v. Commissioner*, 53 T.C. 459 (1969), the shareholders of a corporation created trusts for their children's benefit. On the same day the trusts were created, the corporation resolved to sell two of its properties, with a fair market value of $420,000, to the trusts. After finding that the corporation received $357,037 in exchange, we held that the shareholders had received a dividend. In rejecting the shareholders' argument that they should not be taxed on the bargain sale because the properties were transferred to trusts, we stated, 53 T.C. at 474–475:

> The device of having a corporation make a transfer of property, for no or insufficient consideration, to a person other than a stockholder has not been too successful in avoiding dividend treatment to the stockholder whose own purposes have been satisfied by such transfer. It has been long recognized that where a corporation has made such a transfer to a member of the stockholder's family, whether it be directly or in trust, the stockholder has enjoyed the use of such property no less than if it had been distributed to him directly. *Percy H. Clark*, 31 B.T.A. 1082 (1935); *Byers v. Commissioner*, 199 F.2d 273 (C.A. 8, 1952), affirming a Memorandum Opinion of this Court. The *Clark* case involved a corporate transfer of property to trusts created by a controlling stockholder for the benefit of his children. As to the issue of whether this transfer should be treated as a distribution to the controlling stockholder, the Court (pp. 1084–1085) made the following disposition:
>
> "The petitioner controlled the Willoughby Co. It acted solely to accommodate him in making the transfer. He enjoyed the use of the property by having

---

[5]In Rev. Rul. 79–50, 1979–1 C.B. 138, respondent ruled that the payment by a corporation of a portion of the premium for a policy on a principal shareholder's life was, under the typical split-dollar arrangement, a dividend to such shareholder. Rev. Rul. 79–50 relied upon Rev. Rul. 64–328 in reaching its conclusion.

it transferred for his own purposes. This was the use he wanted to make of the property. He would have enjoyed it no more had it been distributed to him directly. The surplus of the corporation was wiped out. For income tax purposes the transaction amounted to the distribution of a taxable dividend, to the extent of the earnings mentioned. * * * "

In the purported sale here involved, we have already determined that the fair market value of the property transferred by United Management Corp. to the trusts exceeded the fair market value of the consideration received by it in the amount of $62,962.70. Put another way, $62,962.70 of the property was transferred by United Management Corp. to the trusts for no consideration. To this extent, therefore, petitioners, in their control of United Management Corp., have enjoyed the use of that part of the property by having it transferred for their own purposes to the trusts created by them for the benefit of their children. They would have enjoyed this no more had it been distributed to them directly. *Percy H. Clark, supra.* It is our holding, accordingly, that the transfer of property from United Management Corp. to the trusts created by petitioners for the benefit of their children, constituted, to the extent that the corporation received less than full consideration from such trusts, a constructive distribution of property to the petitioners.

Similarly, petitioners enjoyed the use of the premium payments by having them made upon policies for the benefit of their family. For this reason, we must sustain respondent's determination.

*Decision will be entered for the respondent.*