LOWERY R. YOUNG, JR. AND CAROLYN C. YOUNG, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Young v. Commissioner
Docket Nos. 2861-94, 2863-94, 2868-94, 2906-94.
United States Tax Court
T.C. Memo 1995-379; 1995 Tax Ct. Memo LEXIS 379; 70 T.C.M. (CCH) 357; August 10, 1995, Filed *379 Decisions will be entered for respondent. John E. Grenier and Frances E. King, for petitioners. Robert W. West, for respondent. ARMEN, Special Trial Judge ARMEN
MEMORANDUM FINDINGS OF FACT AND OPINION ARMEN, Special Trial Judge: These consolidated cases were assigned pursuant to the provisions of section 7443A(b)(3) and Rules 180, 181, and 182. [2]
Respondent determined deficiencies in petitioners' Federal income taxes for the taxable year 1990 as follows: Docket
No.
Petitioners
Deficiency
2861-94
Lowery R. Young, Jr. & Carolyn C. Young
$ 2,100
2863-94
Leon W. Bell & Debbie W. Bell
1,260
2868-94
Bill V. Hewett & Ellen Marie Hewett
2,100
2906-94
Lonnie G. McCormick & Susan R. McCormick
2,100
The only issue for decision is whether petitioners received constructive dividends from Radiology Associates, *380 P.C. as a consequence of payments made by it to two life insurance companies. [3] Not before the Court is the issue of whether such payments are deductible by Radiology Associates, P.C. FINDINGS OF FACT [4]
Some of the facts have been stipulated, and they are so found. Petitioners resided in *381 Huntsville, Alabama, at the time their petitions were filed with the Court. Petitioners Lowery R. Young, Jr. (Young), Leon W. Bell (Bell), Bill V. Hewett (Hewett), and Lonnie G. McCormick (McCormick) are medical doctors specializing in radiology. [5] At all times relevant to this proceeding, petitioners provided radiological services as employees of Radiology Associates, P.C. (Radiology Associates). Radiology Associates is a professional corporation that provides medical radiological services in Huntsville, Alabama. In 1990, Radiology Associates was owned equally by eight shareholders, each of whom owned 12.5 percent of the stock. All of the shareholders were medical doctors providing radiological services as employees of Radiology Associates. Petitioners were all shareholders of Radiology Associates. Together, petitioners owned 50 percent of the stock of Radiology Associates. Radiology Associates applied to participate *382 in the group life insurance policies offered by two related life insurance companies (collectively, the Insurance Companies), namely, General Services Life Insurance Company (General Services) and Pacific Fidelity Life Insurance Company (Pacific Fidelity). In or before January 1987, Radiology Associates adopted the Pacific Fidelity master policy. In September 1988, Radiology Associates adopted the General Services master policy. Petitioners each filed separate applications for life insurance under the group master policies (collectively, the policies). Petitioners' applications for group life insurance coverage were approved by the Insurance Companies. Petitioners were all covered by an insurance program identified by the Insurance Companies as "Direct Recognition Life I". Petitioners obtained coverage as follows: Coverage
Certificate
Petitioner
Insurer
Date
Date
Face Value
Young
General Services
9/20/88
11/4/88
[1] $ 2,000,000
Bell
Pacific Fidelity
4/18/89
3/29/88
1,030,000
Hewett
Pacific Fidelity
1/31/87
1/21/87
1,000,000
McCormick
Pacific Fidelity
9/27/87
1/19/88
1,350,000
*383 Bell and Hewett each owned the certificates on their own lives. Susan R. McCormick owned the certificate on the life of McCormick, while the certificate on Young's life was owned by the Lowery and Carolyn Young Trust. [6]
Radiology Associates, the Insurance Companies, and the policy owners entered into an agreement whereby: (1) The Insurance Companies characterized as loans certain checks made out by the Insurance Companies to the Insurance Companies and to Radiology Associates; (2) the foregoing checks were endorsed by Radiology Associates and returned to the Insurance Companies characterized as unscheduled premium payments for each of the petitioners (sometimes referred to as the initial payments); (3) on the same day that the Insurance Companies recorded the loans, they recorded the initial payments from Radiology Associates as unscheduled premium payments for *384 each of the petitioners rather than as loan repayments; (4) Radiology Associates agreed to pay annually to the Insurance Companies an amount equal to 15 percent of the amounts characterized as loans (sometimes referred to as the annual payments) until such time that the amounts characterized as loans had been recorded as repaid by the Insurance Companies; (5) Radiology Associates and the Insurance Companies recorded the annual payments as interest payments; and (6) upon the death or departure from Radiology Associates of any of the petitioners, the amount characterized as outstanding debt would be subtracted by the Insurance Companies either from the amount of that petitioner's death benefit or from the cash value of that petitioner's policy and recorded as a loan repayment by either General Services or Pacific Fidelity. The following chart indicates the amounts characterized as loans and as unscheduled premium payments for each petitioner: Insured-Petitioner
Young
Bell
Hewett
McCormick
Amount characterized
as loan from the Insurance
Companies to Radiology
Associates:
$ 50,000
$ 30,000
$ 50,000
$ 50,000
Amount characterized as
unscheduled premium payment
from Radiology Associates to
the Insurance Companies:
50,000
30,000
50,000
50,000
Amount characterized as
annual interest payment:
7,500
4,500
7,500
7,500
*385 Between 1987 and 1994, Radiology Associates and petitioners made annual payments to the Insurance Companies as follows: Young
Date
Amount
Amount
Paid by
Paid by
Insured
Radiology
Associates
9/20/88
$ 5,000
$ 7,500
9/29/89
5,000
7,500
10/17/90
5,000
7,500
9/18/91
5,000
7,500
9/10/92
--  7,500
9/16/92
5,000
--  9/22/93
5,000
7,500
9/19/94
5,000
7,500
Bell
Date
Amount
Amount
Paid by
Paid by
Insured
Radiology
Associates
4/18/89
$ 3,500
$ 4,500
5/14/90
--  4,500
6/20/90
3,500
--  4/26/91
3,500
4,500
4/22/92
--  4,500
5/13/92
3,500
--  4/19/93
--  4,500
5/10/93
3,500
--  4/19/94
3,500
--  4/21/94
--  4,500
Hewett
Date
Amount
Amount
Paid by
Paid by
Insured
Radiology
Associates
1/31/87
$ 5,000
$ 7,500
2/23/88
5,000
--  2/24/88
--  7,500
2/22/89
5,000
7,500
1/31/90
5,000
7,500
1/28/91
5,000
7,500
1/30/92
5,000
7,500
2/9/93
5,000
7,500
3/18/94
5,000
7,500
McCormick
Date
Amount
Amount
Paid by
Paid by
Insured
Radiology
Associates
9/27/87
$ 4,200
$ 7,500
9/28/88
4,200
7,500
9/29/89
4,200
7,500
10/26/90
4,200
7,500
9/18/91
4,200
7,500
9/22/92
4,200
7,500
-- policy --
-- converted --
*386 The amounts paid by petitioners were characterized by petitioners and the Insurance Companies as premium payments. The amounts paid by Radiology Associates were characterized by petitioners, Radiology Associates, and the Insurance Companies as interest payments. Petitioners benefited from the annual payments by Radiology Associates to the Insurance Companies because those payments increased the cash values of the policies, as well as the death benefits payable under the policies. Radiology Associates has no right to recover any of the annual payments to the Insurance Companies or any of the earnings thereon. Petitioners failed to include in income amounts purportedly paid as interest by Radiology Associates to the Insurance Companies in 1990. Respondent determined that these payments are constructive dividends to petitioners, and that the payments are therefore includable in petitioners' income. OPINION A. Introduction
We begin by noting that, as a general rule, the Commissioner's determinations are presumed correct, and that the taxpayer bears the burden of proving that those determinations are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S 111, 115 (1933). *387 Section 301(a) and (c)(1) requires the inclusion in a taxpayer's gross income of amounts received as dividends. Section 316(a) defines a dividend as "any distribution of property made by a corporation to its shareholders -- (1) out of its earnings and profits accumulated after February 28, 1913, or (2) out of its earnings and profits of the taxable year". It is not necessary that a corporation intend a dividend or that the distribution be termed a dividend or recorded as such. Dolese v. United States, 605 F.2d 1146, 1148 (10th Cir. 1979). Dividends may be formally declared or they may be constructive. Ireland v. United States, 621 F.2d 731 (5th Cir. 1980). A constructive dividend is paid when a corporation confers an economic benefit on a shareholder without expectation of repayment. Truesdell v. Commissioner, 89 T.C. 1280 (1987). To be taxable, the expenditure must represent some direct benefit to the shareholder and have no more than an incidental benefit to the corporation. Dolese v. United States, supra at 1152. B. Section 264 Does Not Control *388 Outcome
To counter respondent's determination that the 1990 annual payments should have been included in income, petitioners rely in part on the provisions of section 264. Section 264 governs the deductibility of amounts paid in connection with insurance contracts. Section 264(a)(4) permits an employer to finance an employee's life insurance by borrowing up to $ 50,000 and deducting the interest thereon. Specifically, section 264(a)(4) provides: (a) General Rule. -- No deduction shall be allowed for -- * * * * (4) Any interest paid or accrued on any indebtedness with respect to 1 or more life insurance policies owned by the taxpayer covering the life of any individual who -- (A) is an officer or employee of, or (B) is financially interested in, any trade or business carried on by the taxpayer to the extent that the aggregate amount of such indebtedness with respect to policies covering such individual exceeds $ 50,000.
Petitioners contend that Congressional policy provides favorable tax treatment of the financing of life insurance policies. Petitioners further contend that section 264 is a comprehensive expression of Congressional policy as to when interest paid on *389 indebtedness to finance life insurance is deductible. Petitioners describe respondent's determinations as an effort to "circumvent the clear mandate of Congress". Petitioners argue that because the amounts characterized as loans from the Insurance Companies to Radiology Associates were within the $ 50,000 safe harbor provided by section 264(a)(4), the annual payments were deductible by Radiology Associates as interest payments. Apparently by extension, and through the use of seemingly circular logic, petitioners contend that the annual payments were interest payments for the use of money and could not have been income to petitioners. We find petitioners' argument unpersuasive because the deductibility of the annual payments by Radiology Associates is not an issue to be decided in this case. [7] Therefore, section 264, which applies only to the deductibility of certain amounts paid in connection with insurance contracts, is not determinative of whether the 1990 annual payments by Radiology Associates must be included in petitioners' income. Moreover, the fact that the amounts characterized as loans by the Insurance Companies and Radiology Associates did not exceed $ 50,000 does *390 not compel the conclusion that those amounts were loans for purposes of applying section 264 or indeed any other section of the Code. C. Annual Payments Benefitted Petitioners
Petitioners also contend that the annual payments were not constructive dividends because they were made primarily for the benefit of Radiology Associates rather than primarily for the benefit of petitioners. In this regard, petitioners contend: (1) The annual payments were for the use of money borrowed by Radiology Associates from the Insurance Company and were not made to finance petitioners' insurance benefits, and (2) the initial payments to the Insurance Companies were premium payments made for the benefit of Radiology Associates as part of an effort to retain skilled radiologists. [8]
*391 We find the foregoing argument unconvincing. Rather, based on the record as a whole, and for the following reasons, we conclude that the annual payments were not made for the use of money borrowed by Radiology Associates from the Insurance Companies. First, once the initial (and essentially simultaneous) exchange of dollars between Radiology Associates and the Insurance Companies was complete, the involvement of Radiology Associates was limited to making the annual payments until, upon the death or departure from Radiology Associates of any of the petitioners, the amount characterized as outstanding debt would be subtracted by the Insurance Companies either from the amount of that petitioner's death benefit or from the cash value of that petitioner's policy and recorded as a loan repayment by either General Services or Pacific Fidelity. Second, the effect of the annual payments was to finance both the cash values in the policies and the death benefits payable under the policies, which was the same as the effect of the premium payments by petitioners. In other words, both the annual payments by Radiology Associates and the premium payments by petitioners were required to fund whole *392 life insurance in the amounts desired by petitioners. Third, the annual payments, although characterized as interest payments, were paid on almost the same dates as the premium payments by petitioners. Based on the foregoing, we also conclude that the initial payments were no more than bookkeeping transactions designed to serve as a predicate for the characterization of the annual payments as interest payments. The transaction in which the Insurance Companies purported to loan funds to Radiology Associates did not produce any genuine debtor-creditor relationship because the transaction had no economic substance. Glass v. Commissioner, 87 T.C. 1087, 1177 (1986), affd. sub nom. Kirchman v. Commissioner, 862 F.2d 1486 (11th cir. 1989). "The substance of a transaction rather than the form in which it is cast is determinative of tax consequences". Golsen v. Commissioner, 54 T.C. 742, 754 (1970), affd. 445 F.2d 985 (10th Cir. 1971). Accordingly, we conclude that the annual payments were premium payments made for the direct and primary benefit of petitioners. D. *393 Split-Dollar Arrangement Did Not Exist
Petitioners also argue that petitioners' life insurance was financed under a "split-dollar" arrangement. The split-dollar arrangement was recognized by respondent as a life insurance financing mechanism in Rev. Rul. 64-328, 1964-2 C.B. 11, in which respondent concluded that an employee involved in a split-dollar arrangement receives an economic benefit to the extent of the amount of the annual premium of which he or she is relieved. In the typical split-dollar arrangement, an employer and an employee, or a corporation and a shareholder, jointly purchase a life insurance contract in which there is a substantial investment element. [9] See Johnson v. Commissioner, 74 T.C. 1316, 1322 (1980). The insured employee or shareholder pays the portion of the annual premium that covers the annual risk charge and the administrative charge (the current cost of insurance coverage; i.e., term life insurance coverage), while the employer or the corporation pays the portion of the premium that relates to the investment component. Id. Generally, the employer or the corporation is entitled *394 to recover, out of the policy proceeds, an amount equal to the cash surrender value of the policy or at least an amount equal to the payments made by the employer or the corporation; i.e., the investment component. Id. The insured's beneficiary is entitled to receive the balance of the policy proceeds; i.e., the risk component. Id.
The benefit of a typical split-dollar arrangement to the employee is generally that the amounts paid as premiums by an employer or a corporation enable the insurance company to generate funds that then pay for the current cost of insurance coverage in later years, so that the portion *395 of the annual premium paid by the insured shareholder decreases. Id. The benefit of a typical split-dollar arrangement to an employer or a corporation is generally that the amounts paid as premium payments by the employer or the corporation are recovered out of the policy proceeds, thereby limiting the cost to the employer or the corporation to the loss of the interest on the amount advanced as premium payments. In a split-dollar arrangement, tax benefits exist as well. In Genshaft v. Commissioner, 64 T.C. 282 (1975), we held that when an employee is relieved of some or all of the annual cost of current insurance coverage as part of a typical split-dollar arrangement, the employee has income equal to the value of the benefit received. Similarly, in Johnson v. Commissioner, supra, we held that when a shareholder is relieved of some or all of the annual cost of current insurance coverage as part of a typical split-dollar arrangement, the shareholder has income equal to the benefit received. The value of the benefit to the taxpayer is equal to the amount of the premium for current insurance coverage that he or she *396 is relieved from paying as a consequence of the payment made by the employer or the corporation. Id. The value of current coverage is generally equal to the cost of term life insurance coverage for the taxable year, as calculated by using either the Federal government's PS 58 Rate Table or term life insurance coverage rates published by the insurer. Black & Skipper, Life Insurance 465-466 (12th ed. 1994). In the typical split-dollar arrangement, the value of the benefit to the taxpayer for tax purposes is significantly less than the amount of the premium payment by the employer or the corporation because the employee or shareholder pays the cost of the current insurance coverage while the employer or the corporation pays the portion of the premium that relates to the investment component. Id.
Two primary types of split-dollar arrangements have been developed: (1) The Endorsement System, and (2) the Collateral Assignment System. Id. at 462-464. Both are designed to protect the interests of the employer or the corporation by ensuring that upon the death or retirement of the insured employee or shareholder, the employer or corporation is entitled to recover, out of the policy *397 proceeds, an amount equal to the cash surrender value of the policy, or at least an amount equal to the payments made by the employer or the corporation. Id.
We have already concluded that the annual payments were functionally premium payments and that the initial payments were no more than bookkeeping transactions designed to serve as a predicate for the characterization of the annual payments as interest payments. Moreover, we have concluded that Radiology Associates has no right to recover any of the annual payments to the Insurance Companies or any of the earnings thereon. Therefore, the annual payments did not represent any part of a split-dollar arrangement. E. Conclusion
The payment of premiums by a corporation on an insurance policy owned by a shareholder confers an economic benefit on the shareholder. Paramount-Richards Theatres, Inc. v. Commissioner, 153 F.2d 602 (5th Cir. 1946), affg. a Memorandum Opinion of this Court. Therefore, the essence of the arrangement by which Radiology Associates made the annual payments to the Insurance Companies was that Radiology Associates conferred an economic benefit on petitioners without expectation *398 of repayment. The annual payments produced a direct benefit to petitioners by increasing the cash values in the policies and by increasing the death benefits payable under the policies. The benefit of the annual payments to Radiology Associates was incidental at best. The annual payments therefore have all the characteristics of constructive dividends. Truesdell v. Commissioner, 89 T.C. 1280 (1987). [10]
*399 We therefore sustain respondent's determination that petitioners each understated their income in 1990 by the amount paid by Radiology Associates to the Insurance Companies on their behalf during 1990. In order to reflect the foregoing, Decisions will be entered for respondent.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Leon W. Bell and Debbie W. Bell, docket No. 2863-94; Bill V. Hewett and Ellen Marie Hewett, docket No. 2868-94; and Lonnie G. McCormick and Susan R. McCormick, docket No. 2906-94.↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. We note that petitioners' Motion to Strike certain portions of respondent's opening brief is pending. Because we decide this case without reference to respondent's alternative argument, petitioners' motion is moot, and we shall deny it on that basis.↩
4. We use the terms "debt", "interest", "loan", "payment", and "unscheduled premium", as well as the derivatives of these terms, merely for the sake of convenience. Our use of these terms should not, therefore, be construed as implying any finding of fact or conclusion of law regarding the transactions described.↩
5. Unless otherwise indicated, references to "petitioners" will be to this group of four individuals.↩
1. The insurance policy issued to Young covered both Young's life and that of Carolyn C. Young.↩
6. The beneficiaries of the policies were, respectively, the Lowery and Carolyn Young Trust, Debbie W. Bell, Ellen Marie Hewett, and Susan R. McCormick.↩
7. Radiology Associates is not a petitioner in this case.↩
8. We note that sec. 264(a)(1) prohibits a taxpayer from deducting amounts paid as premiums on any life insurance policy covering the life of any officer, employee, or other person financially interested in any trade or business carried on by the taxpayer, when the taxpayer is directly or indirectly a beneficiary under such policy.↩
9. The investment portion is that portion of the premium remaining after the current cost of insurance coverage (risk charges and administrative charges) has been paid. The investment portion provides cash values: (1) Can be invested by the insurance company on behalf of the policyholder to generate funds for the policy account, and (2) may be used later to pay a portion of the actual insurance costs.↩
10. Petitioners state that "There is no evidence in the record to support a calculation of earnings and profits in 1990 under section 312 of the Code for purposes of sections 301 and 316." This evidence was in petitioners' control. Their failure to introduce evidence that the earnings and profits of Radiology Associates could not support constructive dividends in the amounts determined by respondent leads the Court to conclude that they have failed to carry their burden of proof in this respect. Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513↩ (10th Cir. 1947). In addition, we note that the corporate income tax return filed by Radiology Associates for the taxable year 1990 reported taxable income in the amount of approximately $ 140,000 and unappropriated retained earnings in the amount of approximately $ 203,000.