ESTATE OF BERNARD KORMAN, ROSLYN KORMAN, EXECUTRIX AND ROSLYN KORMAN, SURVIVING WIFE, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Estate of Korman v. Commissioner
Docket Nos. 3902-80, 16408-80, 20536-83, 20557-83.
United States Tax Court
T.C. Memo 1987-120; 1987 Tax Ct. Memo LEXIS 116; 53 T.C.M. (CCH) 292; T.C.M. (RIA) 87120; March 4, 1987. Michael D. Hess,Stanley D. Bernstein,Michael I. Saltzman,William Natbony,David M. Stern,Laurence Keiser,Manuel W. Gottlieb, and Steven R. Frankel, for the petitioners. Julius A. Jove and Bernard Goldstein, for the respondent. CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined deficiencies in petitioners' Federal income taxes and Bernard Korman's Federal estate tax as follows: Docket
Taxable
Number
Tax
Years
Deficiencies
3902-80
Income
[2] 1972
$2,974.00
1973
45,900.00
1974
47,697.00
1975
86,608.00
1976
71,994.00
16408-80
Estate
[3] 266,508.43
20536-83
Income
1977
278,501.06
1978
166,371.65
1979
175,459.29
20557-83
Income
1978
128,633.90
*117 Following concessions by the parties, the issues for decision are: 1) Whether the transaction was without economic substance; 2) Whether the partnership acquired the benefits and burdens of ownership of the property; 3) Whether the transaction was entered into for profit; and 4) Whether the purchase price exceeded the fair market value of the property. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. All of the parties resided in the state of New York at the times they filed their respective petitions. Arlen Realty, Inc. (Arlen) is a Pennsylvania corporation with an office in New York, New York. Arlen owns a number of subsidiary companies which are involved in real estate related operations, such as property acquisition, development, operation, managment, and brokerage. Its real estate investment portfolio at one point exceeded $500 million and it has owned properties located throughout the United States. Because Arlen was having cash flow difficulties in the early to mid 1970's, it devised a pro forma transaction which it used to sell some of its *118 properties to limited partnerships in which it (Arlen) would serve as the general partner. Seven Oaks Associates (the partnership) is one such limited partnership and was formed under Maryland law in 1975 with Arlen as the sole general partner and with Bernard Korman (Korman), Robert Schlanger (Schlanger), Allan C. Rabinowitz and Wilbur M. Rabinowitz as the limited partners. The purpose of Seven Oaks Associates, as recited in the partnership agreement, was to acquire, hold, and operate real property. The partnership agreement and the certificate of limited partnership, both of which are dated October 1, 1975, provide for the following partnership interests in, and capital contributions to, Seven Oaks Associates: Capital Contribution
Partner
Interest
Cash
Nonrecourse Note [4]
Arlen
1.00%
Korman
29.14 11,250
338,445
Schlanger
9.70 3,750
112,815
Allan
Rabinowitz
30.08 12,500
349,370
Wilbur
Rabinowitz
30.08 12,500
349,370
$40,000
$1,150,000
On November 1, 1975, Arlen sold the Seven Oaks Garden Apartments (the property) to the *119 partnership. Arlen executed a deed for the apartment building and a 30-year lease for the land underlying it, as well as other documents relating to the transaction. The lease agreement provided for two renewal options which could be exercised by the partnership, each enabling it to extend the lease term for a period of 10 years, and required that the ownership of the buildings would revert to Arlen at the expiration of the lease term. The document also prohibited any transfer or encumbrance of the leasehold or of the apartment buildings. Payment for the purchase took the form of $40,000 cash (contributed by the four limited partners), a $1,150,000 nonrecourse promissory note, and a $7,135,000 nonrecourse purchase money wraparound deed of trust and note. These three elements composed the $8,325,000 consideration recited in the contract of sale dated November 1, 1975 (the purchase agreement), which was executed by Arlen both as seller and as general partner of the buyer. The transaction was structured and negotiated primarily by Douglas Crocker (Crocker), an executive officer of Arlen and Martin C. Barell, of the law firm of Golenbock and Barell. In 1975 and 1976 Arlen was a *120 client of Golenbock and Barell, as were each of the limited partners. The firm handled the closing of the transaction and prepared numerous documents relating to the deal. The structure of the transaction had been used in other property sales made by Arlen and was adopted because Arlen was in desperate need of cash in 1975 and 1976. Arlen reported accumulated net operating losses in excess of $70,000,000 on its corporation income tax return for the period ending February 29, 1976. The language of the purchase agreement between Arlen and the partnership specified that the agreement contained all of the terms agreed upon by the parties regarding the transaction. It further provided that there could be no amendment, alteration, or modification of the agreement unless the same were in writing and signed by the party to be charged. The "closing statement" prepared by Golenbock and Barell contained a summary of the transaction and a schedule of ten documents relating to the deal. At the time of the transaction in November 1975, there were two existing mortgages on the property, the outstanding balances of which totalled $4,410,226.45 (hereafter collectively referred to as the first *121 mortgage). Through the device of the purchase money wraparound deed of trust and note, Arlen agreed to remain liable on the first mortgage and the partnership agreed to take the property subject to that indebtedness. The partnership made payment to Arlen on the $7,135,000 wraparound purchase money note and Arlen used the money to make its payments on the first mortgage. Thus, the $4,410,226.45 existing indebtedness continued to be a primary lien on the property and the wraparound deed of trust created a subordinate lien in favor of Arlen, but only to the extent of $2,724,773.55, the difference between the $7,135,000 purchase money note and the $4,410,226.45 first mortgage indebtedness. This $7,135,000 debt to Arlen was nonrecourse, and was secured by a subordinate encumbrance on the apartment buildings and the land lease. Interest accrued at 6-1/2 percent per annum and repayment was to be made by monthly installments of principal and interest in the amount of $41,625 during the period December 1, 1975 through September 1, 1988, with a balloon payment of the remaining principal balance on October 1, 1988. Payment by the partnership of an amount less than the prescribed monthly *122 installment would not constitute a default under the terms of the note if the amount paid were sufficient for Arlen to meet its payments on the first mortgage. The note also required payment of "additional interest" at the rate of 2 percent per annum, payable monthly, but contingent upon the existence of sufficient net income from operation of the property to make such payments. Any deficits under this provision were to be accumulated and paid from available net income at a later payment date or dates within the "payment year," which the purchase money note defined as November 1 through October 31. If any accumulated deficit were to exist at the end of a payment year, payment of it would be deemed waived by Arlen. The $1,150,000 promissory note from the partnership to Arlen was likewise nonrecourse, and was "secured" only by the promissory notes in the same total amount made by the limited partners to the partnership. The note provided that no payment of principal was due until December 31, 1985. The stated interest of 10 percent per annum was to be paid in monthly installments of $9,583.33 each, beginning on December 1, 1975. Payment of one half of each of these installments *123 could be deferred, at the option of the partnership, until December 31, 1985, provided that it had not defaulted on the note at the time of the payment. The lease agreement required the partnership to pay both an annual fixed rental and variable "additional rental." The fixed rental payments were to be in the annual amount of $43,000 from the date of execution of the lease agreement until December 12, 1980, and $63,000 thereafter. The additional rental payments were to equal 50 percent of the "cash flow," defined as gross rentals less operating expenses in excess of $57,500. Operating expenses were defined to include one-third of all regular payments of interest and amortization payable under the purchase money mortgage and the amount of the fixed rental. Sometime following the execution of the lease agreement, a modification to the lease agreement was executed changing the additional rental from 50 percent of cash flow in excess of $57,500 to 5 percent. Pursuant to the partnership agreement, Arlen held an option which permitted it to obtain a 70 percent partnership interest, either as a general partner or as a limited partner, in income and losses by making, subsequent to December 1, 1980, a *124 capital contribution of $1,000,000. [5] This sum was to be used to make a prepayment of principal (on the purchase money note) which the partnership owed to Arlen. If the option were execised, Arlen would also be entitled to priority distribution over all other partnership interests to the extent of $50,000 per year. For financial accounting purposes, the property was reported to the Securities Exchange Commission as being in the inventory of Arlen as of February 29, 1976. Arlen's corporate income tax return, Form 1120, for its taxable year ended February 29, 1976 shows a sale of the property on October 1, 1975 for the gross sales price of $8,325,000. Of the $4,266,299 net profit from the sale, Arlen reported $20,244 as gain pursuant to the installment sale provisions *125 of section 453. [6]
On November 10, 1975, Metropolitan Glass & Plastic Containers, Inc. (Metropolitan Glass) made a low interest loan to Arlen in the amount of $1,551,000. Metropolitan Glass is a New York corporation which is wholly owned in equal shares by Wilbur M. Rabinowitz and Allan C. Rabinowitz. The loan was evidenced by a promissory note executed on November 10, 1975 and was secured by a security interest in a deed of trust held by an affiliate of Arlen and a mortgage on an Alabama apartment property owned by another affiliate of Arlen. Although none of the limited partners was a party to the promissory note, Schlanger, Korman, and Metropolitan Glass executed a document entitled "Participation Agreement," also dated November 10, 1975. Under that agreement, Metropolitan Glass transferred to Schlanger and Korman proportionate interests in its rights under the note it had received from Arlen in exchange for cash payments. None of the documents related to the sale of the property referred to this loan either as consideration *126 for the transaction or otherwise. Arlen's deed of the buildings to the partnership was never recorded. Although executed in November 1975, the memorandum of lease was not recorded until May 1, 1978. The purchase money wrap-around deed of trust, originally executed in November 1975 and modified in March 1978, was not recorded until May 1, 1978. OPINION The first issue for consideration is whether the transaction in issue was so lacking in economic substance as to be considered without effect for Federal tax purposes. Transactions which are entered into solely for the purpose of obtaining tax benefits and which are without economic substance will not be given effect for Federal tax purposes. ; ; . The economic substance of a transaction, rather than its form, is controlling. . In Falsetti, we viewed the totality of facts and circumstances *127 as establishing that a purported purchase of real property was not to be given effect for Federal tax purposes. In determining that the purchase lacked the requisite economic substance, we took into consideration the absence of indicia of arm's-length dealing, drastically inflated sales prices, and a disregard for contractual terms. . The parties in this case appear to have generally abided by the terms of their contractual arrangements, albeit, the terms of many portions of this deal were flexible. The transaction here in issue, however, was so clearly designed to transfer the tax benefits of ownership of the property to the partnership while allowing Arlen to retain nearly all potential economic benefits that we find it to be utterly devoid of economic substance. The purported sale of the property had no semblance of an arm's-length deal. Arlen was effectively both buyer and seller of the property and the law firm which drafted the documentation represented all parties to the transaction. The terms of the deal are clearly the product of a single party *128 having full control of transaction. This is demonstrated by the fact that the property never left Arlen's control, the purchase price was severely inflated (see our discussion infra), the lack of any risk assumed by petitioners, and Arlen's ability to secure for itself almost all profits which might occur. Petitioners' willingness to allow Arlen full control of the transaction was the result of promised tax benefits and a lack of personal financial risk. The limited partners invested a total of only $40,000 cash in this alleged $8,325,000 purchase. This was less than 0.5 percent of the purchase price. Except to the extent that petitioners made a low interest loan as part of the consideration for the purchase, the partnership's only other investment in the property was in the form of nonrecourse notes. The purchase and lease terms of the transaction were structured so that Arlen would not be required to surrender the cash flow generated by the property and the partnership would not have to invest funds to prevent default. This was done by injecting contingent payments into almost all aspects of the transaction. The payments called for by the $7,135,000 wraparound mortgage *129 equaled approximately $500,000 per year. The mortgage, however, was not considered to be in default unless the payments made on it were insufficient for Arlen to make payments on the underlying $4,410,226.45 mortgage. Further, if the partnership earned sufficient funds from the property to cover its fixed expenses, the terms of the wraparound mortgage called for payment of an additional 2 percent interest, which would initially equal approximately $140,000 per year. The $1,150,000 nonrecourse promissory note called for payments of interest equal to approximately $115,000 per year. One half of these payments, however, could be deferred, at the option of the partnership, until the date of maturity of the note. Similarly, the land lease called for a fixed rental payment of $43,000 per year and, after its amendment, an additional rental of 5 percent of the cash flow generated by the partnership in excess of $57,500. Therefore, the terms of the nonrecourse notes alone allowed the annual payments made by the partnership to fluctuate by approximately $200,000 plus the difference between the payments due on the underlying mortgage and the wraparound mortgage, depending on the cash flow *130 generated by the property. These terms were clearly intended to allow Arlen to absorb all of the cash flow from the property while allowing the partnership to avoid default without having to invest funds in the property in excess of its $40,000 down payment. Further, if the income generated by the property were significantly in excess of the partnership's fixed and contingent payments, Arlen could obtain a 70 percent interest in the partnership by making, subsequent to December 1, 1980, a capital contribution of approximately 12 percent of the purported purchase price. The partnership agreement required that the capital contribution be used to make a prepayment of principal on the purchase money note which the partnership owed to Arlen. Thus, Arlen could secure for itself 70 percent of any distributions from the partnership, including a $50,000 preference for such distributions, by taking $1,000,000 from its right pocket and putting it into its left. While we believe that the low interest loan from Metropolitan Glass was part of the consideration for the deal, its use further discredits the transaction, rather than helping to revive its credibility. One of petitioners' expert *131 witnesses determined that the loan to Arlen had a discounted value of approximately $1,000,000. Although the limited partners were providing Arlen with cash of $1,551,000, they received paper in return worth only approximately $1,000,000. Neither amount was included in either the partnership's basis in the property or the parties' bases in their partnership interests. Petitioners had no economic basis for making this loan other than to induce Arlen to enter into the transaction here in issue with the resulting tax benefits to petitioners. Arlen, on the other hand, desired to receive its economic benefits from the deal in a manner which would allow it to avoid paying tax on such benefits. Being in complete control of the transaction, Arlen arranged for the low interest loan to be the form in which it would receive most of its economic benefits rather than receiving an additional $1,551,000 from the sale of the property, and for the loan to be completely disassociated from the alleged sale of the property. After arranging this form for the transaction, Arlen reported only $20,244 of installment income from a reported $4,266,299 of taxable gain in the year of sale, while receiving *132 $1,591,000 cash in hand from the Metropolitan Glass loan and the $40,000 cash down payment. Clearly, these arrangements were solely motivated by tax considerations and are contrary to common business sense. Respondent also argues that the transaction's lack of economic substance is demonstrated by petitioners' lack of concern for the timely recording of the memorandum of lease and the failure to record the partnership's deed to the property. Petitioners contend that the partnership delayed recording the documents in order to avoid the Maryland State transfer tax which would be applicable to the sale of the property. Petitioners undoubtedly wished to avoid the state transfer tax and were willing to forgo having the deed recorded because they were concerned solely with obtaining tax benefits, rather than with obtaining title to the property. Tax avoidance, at any level of government, was clearly the primary focus of this entire transaction. As a general policy matter we will not view petitioners' actions in attempting to avoid state taxes as bolstering the economic substance of the transaction for Federal tax purposes. We next direct our attention to the fair market value of *133 the property. Respondent argues that the price purportedly paid by the partnership for the property, i.e., $8,325,000, substantially exceeded its fair market value of $4,600,000. Petitioners contend that the fair market value was substantially higher than that alleged by respondent, but admit that it was less than the purported purchase price of the property. The purchase agreement recited a consideration of $8,325,000 composed of $40,000 cash and nonrecourse debt for the remainder. Petitioners argue that even more was paid for the property in the form of the Metropolitan Glass loan. Petitioners now contend on brief, however, that the fair market value of the property at the time of the transaction was $7,750,000. Thus, we are not faced with deciding whether the sale price exceeded the value of the property, but we must rather determine by how much the price exceeded the value. Respondent obtained an appraisal of the property in May 1984 from B. Emmerson Treffer (Treffer), a real property appraiser with offices in Annapolis, Maryland who is also a real estate broker licensed in the State of Maryland. Petitioners have offered in evidence an appraisal report (the White appraisal) *134 prepared in August 1980 for the law firm of Golenbock & Barell by William A. White & Sons (White), a real estate firm located in New York, New York. The report's certificate of appraisal bears the signatures of Robert Von Ancken (Von Ancken), Senior Vice-President in charge of the appraisal department at White, and Dennis Duffy (Duffy), one of four appraisers in that department. The fair market value of the entire property (land and improvements) was determined by Treffer to be $5,200,000 as of November 1975. Of this amount, Treffer determined that $4,600,000 was allocable to the buildings and approximately $600,000 was allocable to the land. The White appraisal estimated the value of the buildings at $7,750,000 and the value of the land at $835,000. Both appraisals utilize the three standard approaches to valuation of real property, namely, 1) the market comparable approach, 2) the income capitalization approach, and 3) the cost approach. The first of these involves comparison of the subject property with sales data on comparable properties in the area. Differences which make a comparable property superior or inferior to the subject property are handled by adjusting the sale *135 price of the comparable property downward or upward, respectively. In the income approach, the net operating income generated by the property is capitalized at a rate derived by analyzing the rate of return on similar investment opportunities. This provides a present value of the expected future income from the property. The cost approach starts with the estimated cost of constructing equivalent improvements to the property and then adds the value of the underlying land. From this is subtracted the amount the existing improvements have diminished in value due to physical deterioration or obsolescence. The White appraisal contains what Von Ancken called a "fourth approach" to value, referred to by him as the "condominium conversion" or "development" approach. He described it as a combination of the market approach and the income approach. The $7,750,000 final estimate of value contained in the White appraisal was made in reliance upon this approach, the premise being that the property would be substantially more valuable if it were improved, converted to condominiums, and sold to individual buyers. The report estimated revenues from sales of the condominium units by examining *136 sales data for other condominium projects in the area. The estimated costs of completing the condominium conversion and the estimated selling costs were subtracted from projected gross sale revenue to arrive upon a final estimate of value. This approach assumes, however, that the partnership was able to perform the condominium conversion. No consideration was given to the fact that the partnership held only an estate for years in the apartment buildings, at the termination of which ownership of the buildings would revert to Arlen. The partnership could convey no more than it owned. It was precluded, by the terms of the lease agreement, from making any manner of assignment or transfer of its interest in the land lease. Likewise, the lease mandated that the partnership could not transfer, lease, or encumber the buildings without written consent of the lessor (Arlen). Even if the partnership could obtain Arlen's consent (as lessor), the most it could have transferred to individual purchasers was an estate for years, since the property would revert to Arlen at the end of the lease term. The estimate of value under the White report's condominium approach was derived from data regarding *137 the sales of other condominium projects. It is certainly not unheard of for a condominium purchaser to willingly purchase an interest which runs for a term of years and not in perpetuity. However, such an interest will clearly have a value which is less than if the estate were perpetual. Comparison of an estate for years (either 30 years or, at most, 50 years if the options are included) with data pertaining to outright sales of other properties is not a valid indicator of value. Neither report relied upon the value derived under the cost approach. With regard to the other two approaches to value, the market comparable and income approaches, the two appraisals utilized similar data yet reached different conclusions. Under the market comparable approach, the average per unit price of the five-property sample used by the White report was remarkably close to that of the eight-property sample used by the Treffer report, and the ranges of value in the two samples were also quite similar. Both appraisals adjusted the comparable sales data to bring them into conformity with the subject property, yet the White report, without explanation, selected a per unit price from the very high *138 end of its range as a basis for determining an estimate of value under the market approach. This was done even though there was strong evidence, known to the appraisers, that the value reported for the one sale which was substantially higher than the other sales was inflated and unreliable. When this one anomalous sample is eliminated, the other data used by the White report support the conclusion reached by Treffer regarding the market comparable valuation of the property. Under the income approach, the estimates of net operating income contained in the two reports were within about 10 percent of each other. The difference in the conclusions of value for the property was therefore primarily attributable to the variance in the capitalization rates utilized. Selection of a capitalization rate is based upon the appraiser's subjective determination of the anticipated return on capital invested in the property. The lower the selected rate is, the higher the estimate of property value will be. Treffer used a capitalization rate of 10.25 percent. The 9.50 percent rate utilized in the White report was derived by examining the return on capital from the perspective of debt and equity *139 components and then combining these into a single rate. It was estimated that the lending market would require a 10.536 percent return on borrowed funds, but that investors would be satisfied with a 6.00 percent return on equity. The selection of this unusually low equity return rate was made based on the assumptions regarding condominium conversion discussed above. Even if petitioners' assumptions and data were to be taken at face value, the White report's estimate of the value for the buildings was only $6,140,000 using the income approach. We note also that the application of Treffer's capitalization rate to the estimate of net operating income in the White report yields a capitalized value within $600,000 of the value determined by Treffer. In addition, Crocker, the person primarily responsible for structuring and negotiating the transaction, testified that in a straight sale of the property, "standing on its own two feet," Arlen would have received a cash consideration somewhere in the range of $400,000 to, at most, $600,000. There is no dispute that the outstanding indebtedness on the property at the time of the transaction between Arlen and the partnership was $4,410,226.45. *140 Thus, the person responsible for preserving Arlen's interest in allegedly arm's-length negotiations believed that the value of the property was no more than approximately $5 million, which is very near the $5.2 million overall value determination made by respondent's expert, Treffer. We conclude that the value of the land and buildings in November 1975 was $5,200,000, and that $4,600,000 of this amount was attributable to the buildings. Thus, we find that the purchase price of the property was inflated by $3,725,000. The evidence demonstrates that this transaction attempted to accomplish the following results: 1) the partnership would receive tax benefits based on an inflated depreciable basis in the property; 2) Arlen would retain all interest in any potential appreciation of the property through the use of an inflated purchase price, Arlen's right to obtain a 70 percent interest in the property by paying itself $1,000,000 and Arlen's control of any disposition of the partnership's interest in the property; and 3) Arlen would retain its interest in the cash flow generated by the property through the use of fluctuating purchase note payments and lease payments, the amount of *141 which depended upon the cash flow generated by the property, and its option to acquire a 70 percent interest. The end result of this transaction was intended to be the transfer to the partnership of the tax benefits associated with the property, while Arlen retained the economic benefits associated with the property and received needed cash from the sale of the tax benefits. As we find this transaction to be wholly lacking in economic substance, it cannot be recognized for Federal tax purposes and petitioners are not entitled to the tax benefits which they have claimed with respect to the transaction. [7]
Decisions will be entered for the respondent in docket Nos. 3902-80, 20536-83, and 20557-83.
Decision will be entered under Rule 155 in docket No. 16408-80.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Estate of Bernard Korman, Roslyn Korman, Executrix, docket No. 16408-80; Allan C. and Eleanor Rabinowitz, docket No. 20536-83; Roslyn Korman, docket No. 20557-83.↩
2. Because of concessions, tax years 1972, 1973, and 1974 in docket No. 3902-80 are no longer before the Court. ↩
3. The amount of the estate tax deficiency in docket No. 16408-80 depends upon the value of Bernard Korman's interest in Seven Oaks Associates at the date of his death and the amount of the income tax liability determined in docket No. 3902-80. Bernard Korman died on March 25, 1976.↩
4. Each note was secured solely by the limited partner's interest in the partnership.↩
5. The partnership agreement gave Arlen latitude to take the 70 percent interest for its own benefit as general partner, or to allow the addition of a limited partner who would take the 70 percent interest upon contribution by Arlen of the $1,000,000. The only restriction was that the admission of the new limited partner could not cause the partnership to be taxed as an association rather than as a partnership.↩
6. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
7. This holding makes it unnecessary for us to discuss the other issues presented by this case.↩