T.C. Memo. 1998-7

UNITED STATES TAX COURT

EUGENE D. LANIER, INC., Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

EUGENE D. AND ERIE P. LANIER, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 9146-93, 9171-93.      Filed January 7, 1998.

Elmo J. Laborde, Jr., for petitioners.

Emile L. Hebert III and Linda J. Bourquin, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

WRIGHT, Judge:  In these consolidated cases, respondent determined deficiencies in, and additions to, the Federal income taxes of petitioners Eugene D. Lanier, Inc. (the Corporation) and Eugene D. and Erie P. Lanier (the Laniers) for taxable year 1987 in the following amounts:

Docket No. 9146-93

| Tax Year | Deficiency | Addition to Tax Sec. 6661(a) |
|----------|------------|------------------------------|
| 1987     | $63,128    | $22,734                      |

Docket No. 9171-93

| Tax Year | Deficiency | Addition to Tax Sec. 6661(a) |
|----------|------------|------------------------------|
| 1987     | $88,370    | $22,093                      |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions, the issues remaining for decision are as follows: (1) Whether the fair market value (FMV) of certain real property sold to the Laniers by their wholly owned Corporation exceeded its purchase price; and (2) whether the Laniers received a constructive dividend in the amount of $13,000 as a result of the Corporation's transfer of that sum to their son's election campaign committee.

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. The Corporation was domiciled in Youngsville, Louisiana, at the time it filed its petition. The Laniers were married and resided in Youngsville, Louisiana, when they filed their petition.

I. Sale of the Property

Beginning in 1969, the Corporation was a franchised Toyota automobile dealership d/b/a Acadian Toyota. The Corporation leased property located at 3203 Johnston Street in Lafayette, Louisiana, from 1969 to 1978. In August 1978, the Corporation acquired the property and improvements located at 5001 Johnston Street, Section 64, T10S-R4E, in Lafayette (the Property), for $566,034 and moved to that address. Beginning in 1979, the Corporation was also a franchised Volvo automobile dealership d/b/a Acadian Toyota-Volvo.

During the taxable year 1987, the Laniers were the Corporation's sole shareholders. G. Talbott Robertson (Robertson), a certified public accountant, informed the Laniers in late 1986 that a "precipitous" decline in real estate values in Lafayette presented the potential opportunity to transfer ownership of the Property from the Corporation to the Laniers without incurring a large tax cost. To that end, Robertson encouraged the Laniers to seek an appraisal of the Property.

The Corporation hired Warren G. Monies (Monies) to appraise the Property. On February 16, 1987, Monies issued an appraisal report which estimated the FMV of the Property to be $424,085 as of that date. Mr. Lanier said that at the time he "thought it [the appraisal] was low."

After receiving Monies' appraisal, the Laniers instructed their attorney to use the selling price of $425,000 in a Credit

Sale executed on March 31, 1987, by which the Property was transferred to the Laniers. The Laniers assumed the mortgage on the Property (which had a balance of approximately $293,000), paid $55,000 in cash, and executed a promissory note in favor of the Corporation in the principal amount of $77,000.

The Corporation reported the disposition of the Property on its 1987 Form 1120, U.S. Corporation Income Tax Return, as being a sale for an amount equal to its adjusted basis in the Property as of March 31, 1987, or $423,468. Accordingly, the Corporation did not report any gain or loss on the transaction. Likewise, the Laniers did not report any income on their joint 1987 Form 1040, U.S. Individual Income Tax Return, as a result of their purchase of the Property.

The Corporation's earnings and profits for taxable year 1987 were $62,581. The Corporation had accumulated earnings and profits as of January 1, 1987, totaling $622,124.

From March 31 to September 28, 1987, the Property was owned by the Laniers, but the premises were leased to the Corporation at a rate of $10,000 per month. The Corporation continued to own and operate its franchised Toyota and Volvo automobile dealerships until September 28, 1987. On that date, the Corporation ceased being a franchised Toyota and Volvo automobile dealership d/b/a Acadian Toyota-Volvo and sold its assets to Harvey, Inc. (Harvey). Also on that date, the Laniers and Harvey entered into a 10-year lease for the Property with an option in

favor of Harvey for an additional 10 years.  The payments called for under the lease were $15,000 per month for the 10-year term commencing September 28, 1987, and $10,000 per month during the option term if the lease were renewed.  Such payments in part reflected the sale of the dealership's assets to Harvey.

As of the sale date, the Property was a rectangular corner parcel with frontage on 3 streets, namely Johnston Street (U.S. Highway 167), Gerald Drive (formerly Whittington Terrace Boulevard) and Empire Drive.  The Property was legally described as follows:

> that certain tract of land, together with all improvements thereon, situated in Section 64, Township 10 South, Range 4 East, Ward 8, Lafayette Parish, Louisiana, having a front on U.S. Highway 167, Johnston Street, of 283.9 feet with a rear line of 286 feet, a depth on the Northeast line of 316.8 feet and a depth on the Southwest line of 310.6 feet.  This parcel contains approximately 2.05 acres, or 89,389 square feet.  * * *

The Property included a large metal-framed sales and service building consisting of approximately 13,495 square feet for the building area and 3,499 square feet for the attached canopies. This main building contained the sales and accounting offices, parts department, storage and service bay areas, and restrooms. The Property also included a smaller woodframed, galvanized metal-clad building (housing the paint and body shop) consisting of approximately 2,510 square feet, as well as a 68,699 square-foot asphalt-paved lot for new and used car display, storage, and customer parking.  In addition, the Property contained two

underground storage tanks.  One was a double-walled tank for gasoline storage and the other was a single-walled tank for waste oil.  Storage tanks were essential to the operation of an automobile dealership with a service area.

The main building was constructed in 1978; in 1987 it had an effective age of 10 years and an estimated remaining economic life of 35 to 40 years.  The paint and body shop building had been moved to the site from a previous dealership; by 1987, it had been refurbished and expanded and is considered to have the same approximate age characteristics as the main building.

As of March 31, 1987, the zoning classification for the Property was Zone BG-General Business.  This  classification permitted a wide range of commercial uses.  The flood zone designation of the Property was FEMA Flood Hazard Zone C, the area of minimal inundation.

Johnston Street is the principal northeast-southwest traffic artery for the City of Lafayette.  The Property is located in the southwestern section of Lafayette, approximately one-half mile northeast of the intersection of Johnston Street and Ambassador Caffery Parkway.  At the time of sale, the Johnston Street corridor in which the Property is situated was a primary commercial corridor in Lafayette.

Of all the metropolitan centers in Louisiana, Lafayette was the hardest hit by the deep recession in the oil and gas industry during the 1980's, losing roughly 22 percent of its jobs between

1983 and early 1987.  The recession was severest during 1985 through 1987, with the lowest point occurring during the first quarter of 1987.

In 1985, 1986, and 1987, at least several prominently located vacant land tracts were available for sale and/or development in the vicinity of the Property.  However, none of those parcels were sold during this period.  Moreover, the market value for all classes of improved commercial real estate had steadily declined, and there was an excess inventory of commercial office, retail, and industrial buildings.  Sales of such properties by repossessing lenders were common in 1987. The availability of financing for new development was minimal at this time, and development reached a virtual standstill.

On March 31, 1987, if the Property had been vacant land, the highest and best use of the Property would have been to hold it for future commercial development.  As then improved, however, the highest and best use of the Property was as an automobile dealership.

II.  The Corporation's $13,000 Transfer to Vance E. Lanier, Inc.

Vance E. Lanier (Vance) is the Laniers' son.  He was an officer of the Corporation in 1987.  Vance was also a candidate for Representative for District 43 of the Louisiana House of Representatives in the election held on October 24, 1987.  Vance E. Lanier, Inc., d/b/a the Committee to Elect Vance Lanier (the Committee), was duly incorporated under the laws of Louisiana.

Vance was the chairman of the Committee and Robertson was its treasurer.

The Committee was organized primarily for the purpose of accepting contributions and making expenditures to effect Vance's election to public office. Robertson insisted upon the corporate form of the Committee due to the limited liability from creditors that such a structure afforded. The Committee maintained its own bank account into which contributions were deposited and from which campaign expenditures were paid. The Committee kept its own accounting and financial records, and filed campaign finance reports with the State of Louisiana.

Prior to his son's candidacy, Eugene D. Lanier had been actively involved in numerous political campaigns and had made frequent monetary contributions thereto. The Corporation had also made contributions to numerous political candidates antedating Vance's campaign. On September 29, 1987, the Corporation lent funds to the cash-strapped Committee. A check in the amount of $13,000 was issued to "Vance Lanier, Inc." by Acadian Toyota-Volvo, a division of the Corporation. The check was endorsed "Vance E. Lanier, Inc., Committee to Elect Vance Lanier" and was designated "for deposit only." The Committee used the proceeds of the loan to pay for various campaign advertising expenses.

The primary election for District 43 was held on October 24, 1987. Vance was not one of the top two candidates in the primary

election and therefore did not qualify for the general election held on November 21, 1987.

On October 30, 1987, after the primary election had taken place, the Corporation determined that there was no realistic possibility that its loan to the Committee would be repaid. Accordingly, the Corporation converted the loan to the Committee into a political contribution. The Corporation reported the contribution as one of a number of nondeductible expenditures on a Schedule M-1, Reconciliation of Income per Books With Income per Return, attached to its 1987 return.

All of the moneys the Committee had classified as loans in its State campaign finance reports were ultimately reclassified as cash contributions; none of the loans were ever repaid. Neither the Laniers nor Vance received any cash distributions from the Committee. The Committee did not assume any of Vance's or the Laniers' debts, nor did it pay any of their personal or educational expenses. In addition, neither the Laniers nor Vance used any Committee property for their own personal benefit.

On February 11, 1993, respondent issued notices of deficiency to the Corporation and the Laniers. In the notices of deficiency, respondent determined that the FMV of the Property was $640,000 on March 31, 1987. Respondent further determined that the selling price of the Property equaled its book value in the hands of the Corporation--$423,468. Among other things, respondent made adjustments to income of $216,532 for both the

Corporation and the Laniers, which amount reflected the difference between the FMV and the selling price/book value of the Property determined by respondent. Respondent also determined that petitioners were liable for additions to tax pursuant to section 6661(a) for a substantial understatement of income tax.

Respondent subsequently conceded that neither the Corporation nor the Laniers are liable for additions to tax pursuant to section 6661(a) for the taxable year 1987. Moreover, respondent conceded at trial that the FMV of the Property was $620,000 rather than $640,000 as previously determined. Respondent further conceded that the Property's selling price was $425,000. Finally, the parties have agreed that $24,370 of the Corporation's net operating loss for 1989 remains available to be carried back to the Corporation's taxable year 1987 if it is decided that the Corporation failed to report taxable income equal to or greater than that amount for 1987.

## OPINION

We must decide the FMV of the Property. We must also decide whether the transfer of $13,000 to the Committee by the Corporation results in the imputation of a constructive dividend to the Laniers.

## I. Did the FMV of the Property exceed $425,000?

Section 311(b)(1) provides that if a corporation distributes its property to its shareholder at a time when the FMV of the

property exceeds the property's adjusted basis in the hands of the distributing corporation, the corporation must recognize a gain as if the property were sold to the shareholder at its FMV.

Section 1.301-1(j), Income Tax Regs., provides that when an individual shareholder purchases property from a corporation for an amount less than the property's FMV, the shareholder may be deemed to have received a distribution to which section 301 applies, i.e., a dividend, to the extent the FMV exceeds the amount paid by the shareholder for the property. See Palmer v. Commissioner, 302 U.S. 63, 69-70 (1937); Green v. United States, 460 F.2d 412, 419 (5th Cir. 1972); Brittingham v. Commissioner, 66 T.C. 373, 409-410 (1976), affd. per curiam 598 F.2d 1375 (5th Cir. 1979).

The term "dividend" is defined in section 316(a) as a distribution of property by a corporation to its shareholders out of its earnings and profits. Dividends are includable in the gross income of a shareholder to the extent of the corporation's earnings and profits for the calendar year when the dividend is paid, along with accumulated earnings and profits. See secs. 301(c)(1), 316(a); Truesdell v. Commissioner, 89 T.C. 1280, 1294-1295 (1987). There is no requirement that the dividend be formally declared or even intended by the distributing corporation. Sachs v. Commissioner, 277 F.2d 879 (8th Cir. 1960), affg. 32 T.C. 815 (1959).

The parties do not dispute that the sale of the Property, if found to be below FMV, results in additional income to both the Corporation and the Laniers.  (In that respect, the Laniers do not deny that the Corporation had adequate earnings and profits to support the finding of a dividend in the amount determined by respondent.)  The principal issue, therefore, is primarily factual; i.e., whether or not the FMV of the Property as of March 31, 1987, exceeded its purchase price of $425,000.

FMV has been defined as the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts.  United States v. Cartwright, 411 U.S. 546, 551 (1973); Marine v. Commissioner, 92 T.C. 958, 982 (1989), affd. without published opinion 921 F.2d 280 (9th Cir. 1991); see sec. 1.170A-1(c)(2), Income Tax Regs. The FMV of property is based upon the "highest and best use" of the property as of its relevant valuation date.  Stanley Works & Subs. v. Commissioner, 87 T.C. 389, 400 (1986); see Hilborn v. Commissioner, 85 T.C. 677, 689 (1985).  The determination of the FMV of property is a question of fact which must be resolved after consideration of all of the evidence in the record.  Morris v. Commissioner, 761 F.2d 1195, 1200 (6th Cir. 1985), affg. T.C. Memo. 1982-508; Jarre v. Commissioner, 64 T.C. 183, 188 (1975); Kaplan v. Commissioner, 43 T.C. 663, 665 (1965).

Petitioners bear the burden of proving that respondent's determination of FMV is incorrect.[1]  Rule 142(a); Estate of Gilford v. Commissioner, 88 T.C. 38, 51 (1987); Burbage v. Commissioner, 82 T.C. 546, 560 (1984), affd. 774 F.2d 644 (4th Cir. 1985).  A transaction between a sole shareholder and his corporation is not an arm's-length transaction and is subject to special scrutiny.  Ingle Coal Corp. v. Commissioner, 174 F.2d 569, 571 (7th Cir. 1949), affg. 10 T.C. 1199 (1948); Estate of Schneider v. Commissioner, 88 T.C. 906, 938 (1987), affd. 855 F.2d 435 (7th Cir. 1988); Yamamoto v. Commissioner, 73 T.C. 946, 954 (1980), affd. without published opinion 672 F.2d 924 (9th Cir. 1982).

Respondent now contends that the Corporation is deemed to have recognized income under section 311 in the amount of $196,532 due to the sale of the Property ($620,000 FMV less the Corporation's adjusted basis).  Respondent also argues that the Laniers must recognize additional income under sections 301 and 316 in the amount of $195,000 ($620,000 FMV less the purchase price).  Petitioners, on the other hand, maintain that the FMV of the Property was $425,000.  On that basis, petitioners argue that they did not receive a constructive dividend.  Petitioners

---

[1]  In response to petitioners' argument, we observe that the fact that respondent has reduced the claimed valuation of the Property from that set forth in the notices of deficiency, without more, does not suffice to relieve petitioners of the burden of proof on this issue.  Estate of Smith v. Commissioner, 57 T.C. 650, 656 (1972), affd. 510 F.2d 479 (2d Cir. 1975).

further assert that the Corporation has already recognized as income the $1,532 difference between the Property's claimed FMV of $425,000 and the Corporation's adjusted basis therein, and that no additional income must be recognized by the Corporation under section 311(b)(1).

The parties primarily rely upon their experts' testimony and reports to support their respective positions regarding the FMV of the Property. Expert opinion sometimes aids the Court in determining valuation; other times, it does not. See Laureys v. Commissioner, 92 T.C. 101, 129 (1989). We evaluate such opinions in light of the demonstrated qualifications of the expert and all other evidence of value in the record. Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990); Parker v. Commissioner, 86 T.C. 547, 561 (1986); Johnson v. Commissioner, 85 T.C. 469, 477 (1985). We are not bound, however, by the opinion of any expert witness when that opinion contravenes our judgment. Estate of Newhouse v. Commissioner, supra at 217; Parker v. Commissioner, supra at 561. Although we may accept the opinion of an expert in its entirety, Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 452 (1980), we also may be selective in the use of any portion thereof, Parker v. Commissioner, supra at 562. Consequently, we take into account expert opinion testimony only to the extent that it aids us in arriving at the FMV of the property.

There are 3 basic methods used to value real property and other assets: (1) The market-data, or sales comparison, approach; (2) the replacement-cost approach; and (3) the capitalization-of-earnings approach. See Marine v. Commissioner, supra at 983.

The market-data approach entails a comparison of the subject property to similar properties sold in the same time frame and geographic area. Differences which make a comparable property superior or inferior to the subject property are accounted for by adjusting the sale price of the comparable property downward or upward, respectively. See Estate of Spruill v. Commissioner, 88 T.C. 1197, 1229 n.24 (1987); Estate of Korman v. Commissioner, T.C. Memo. 1987-120. The validity of this valuation method depends to a great degree upon the comparables selected and the reasonableness of the adjustments made thereto. See Wolfsen Land & Cattle Co. v. Commissioner, 72 T.C. 1, 19-20 (1979).

The replacement-cost approach begins with an estimation of the value of the underlying land and then adds the cost of constructing equivalent improvements thereupon as if the improvements were new. From this figure is subtracted the amount that the existing improvements have diminished in value due to physical depreciation or obsolescence. Marine v. Commissioner, supra at 983.

The capitalization-of-earnings approach to valuation is premised on the theory that the value of property correlates with

its expected income-producing power. In simple terms, under this approach, value equals net annual operating income divided by a capitalization rate. The capitalization rate is influenced by many factors. Although basically related to the rate of interest, it also includes risk and liquidity factors and a recapture of capital component. See Narver v. Commissioner, 75 T.C. 53, 90 n.17 (1980), affd. 670 F.2d 855 (9th Cir. 1982). The selection of a capitalization rate represents the appraiser's subjective determination of the anticipated return on capital invested in the property. The lower the rate of capitalization, the higher the estimate of property value will be. See Estate of Korman v. Commissioner, supra.

A. Respondent's Expert

Respondent relies principally upon the report and testimony of J. Harold Lambert (Lambert), a self-employed certified general real property appraiser. Lambert's report was prepared in October 1994. The parties have stipulated that Lambert is an expert. Lambert utilized the replacement-cost, market-data, and capitalization-of-earnings approaches in appraising the value of the Property as of March 31, 1987.

Under the replacement-cost approach, Lambert viewed 5 vacant land sales (vacant land sales) as comparables, to which he made adjustments for such factors as location, corner influence, and size. He valued the land at $3.50 per square foot, or $313,000 (rounded). He then determined the direct cost of the

improvements to be $521,111 using the Marshall and Swift Cost Manual. To that figure he added certain indirect costs of $14,106 and an "entrepreneurial fee" of $114,500. (Lambert described an entrepreneurial fee as a "soft cost" charged by the coordinator/developer of a project for the time and risk involved in bringing it to fruition.) Thus, Lambert's estimate of the replacement cost new for the improvements was $649,717. Lambert then estimated total depreciation, including physical depreciation and external obsolescence, to be $259,887. Adding together the value of the land and the estimated depreciated cost of improvements, Lambert valued the Property at $702,800.

For the market-data approach, Lambert chose 5 sales of improved properties (improved sale), all of which were automobile dealerships, as comparables. The unit of comparison was the price paid per square foot of gross building area, including land. He made adjustments for such factors as location, age and condition of the improvements, and size. Under this method, Lambert estimated the value of the Property at $636,300, rounded.

Under the capitalization-of-earnings approach, Lambert examined the lease rates for 9 properties (lease comparable). He estimated a rental rate for the Property of $6 per square foot and a gross building area of 13,980 square feet which, after expenses, yielded a net annual operating income for the Property of $76,295. Lambert then used the mortgage-equity band of investment technique to estimate a capitalization rate of 12.45

percent.  He arrived at a value for the Property of $612,800 (rounded).

After analyzing the values derived under each of the above approaches, Lambert determined that the FMV of the Property was $620,000.

For the reasons discussed below, we conclude that Lambert's report is filled with shortcomings and errors which, in sum, prove fatal to his conclusion regarding the FMV of the Property. See Wolfsen Land & Cattle Co. v. Commissioner, 72 T.C. at 21 ("we note that the reliability of this expert's opinion was severely compromised by several errors in his calculations which surfaced during the trial held herein.").

Lambert analyzed a total of 19 transactions to support his valuation of the Property as of March 31, 1987, yet 15 of those transactions had not transpired as of the valuation date.  Among the dispositions taking place after the sale of the Property, Vacant Land Sale No. 5 occurred on September 30, 1988.  Improved Sale No. 3 did not take place until November 1988.  (A sale of the same property at a lower price, which Lambert did not consider in his analysis, had occurred in November 1986.) Improved Sale No. 2 did not take place until October 31, 1990. Improved Sale No. 4 did not occur until February 1989.  Moreover, Lease Comparables 4 and 8 did not commence until September 1991. Lease Comparable 5 was not in effect until May 6, 1993.  Lease Comparable 6 was not entered into until June 30, 1992.

Events occurring subsequent to the valuation date are not considered in determining FMV of the property, except to the extent the events are reasonably foreseeable on the valuation date. See First Natl. Bank of Kenosha v. United States, 763 F.2d 891, 893-894 (7th Cir. 1985); Estate of Spruill v. Commissioner, 88 T.C. at 1228. However, this Court has drawn a distinction between subsequent events which affect the value of the property and those which merely provide evidence of such value on the valuation date. See Estate of Jung v. Commissioner, 101 T.C. 412, 431 (1993). Subsequent events which affect the value of the property (such as the discovery of oil on the real property) can be taken into account only if they are reasonably foreseeable on the valuation date. Estate of Jung, supra. Conversely, subsequent events which merely provide evidence of the value of the property on the valuation date can be taken into account regardless of whether they are foreseeable on the valuation date. Estate of Jung v. Commissioner, supra. In considering such events, appropriate adjustments must be made for changes in inflation, general economic conditions and other similar factors. Estate of Jung v. Commissioner, supra.

The mere fact that the comparables used by Lambert are subsequent in time to the valuation date is not fatal to Lambert's determination.[2] See Estate of Smith v. Commissioner,

_____

[2] We are not discrediting Lambert's use of the comparables
(continued...)

57 T.C. 650, 659 n.8 (1972), affd. 510 F.2d 479 (2d Cir. 1975) (Provided they are not too far removed from the * * * [valuation] date, sales before and after such date may be used to corroborate the ultimate determination of * * * [FMV].) While comparables entered into subsequent to the valuation date can be used, adjustments need to be taken into account to reflect market changes between the comparable's date of sale and the valuation date. In this case, Lambert did not make any time adjustments. Under the replacement-cost approach, Vacant Land Sale No. 5 was used, but Lambert did not make any market condition adjustment to reflect the 18 months that transpired after the valuation date. Under the market-data approach, Improved Sales No. 2, 3, and 4 were used, but again Lambert did not make any adjustment for market condition and time. Lambert merely concluded that no clear evidence existed to make an adjustment. With the capitalization-of-earnings approach, Lease Comparables No. 4, 5, 6, and 8 were used. In making his determination, Lambert used the current rental rates, which covered the following periods: September 1991 to September 1996 for Lease Comparable No. 4; May 1, 1993 to April 30, 1998 for Lease Comparable No. 5; January 1, 1993 to December 31, 1997 for Lease Comparable No. 6; and September 1, 1991 (annual lease) for Lease Comparable No. 8. At

-------

[2](...continued)
mentioned. For example, Vacant Land Sale No. 5 is a reliable comparable because it is located in the Johnston corridor and it is similar in size and shape to the Property.

trial, Lambert admitted he should have used an earlier lease for Lease Comparable No. 4 in effect on March 31, 1987 (which changed the rental rate from $5.24 in 1991 to $3.38 in 1987).

We think that the use of these comparables without relevant adjustments for market conditions and time was inappropriate in light of the "precipitous" decline in real estate values in Lafayette in late 1986 and the fact that the recession in Lafayette was severest during 1985 through 1987, with the lowest point occurring during the first quarter of 1987 when the transfer of the Property occurred.  Because the validity of an expert's determination depends upon on the comparables selected and the adjustments, Wolfsen Land & Cattle Co. v. Commissioner, 72 T.C. at 19-20, we discount Lambert's determination of the Property's FMV.

Moreover, 10 of the transactions used by Lambert in his appraisal report took place outside of the Lafayette market.  Of those transactions, Lease Comparables 1 and 2 were located in Sulphur, Louisiana.  Lease Comparable 3 was in Lake Charles, Louisiana.  Lease Comparables 5, 6, 8, and 9 were in Baton Rouge, Louisiana.  Lease Comparable 7 was in Gonzales, Louisiana. Lambert does not provide any information in his report that the lease rates in these various markets were similar to those in Lafayette; he himself stated that the Lafayette market suffered the most in Louisiana due to the recession.  Thus, we conclude

that the foregoing transactions are not reliable in determining the Property's FMV.

Lambert made other analytical errors as well. Among the more noteworthy, Vacant Land Sale No. 2 was not actually vacant but contained a metal warehouse and small office building. Lambert assigned a value of only $10,000 to these 2 buildings, which had the effect of inflating the amount paid for the underlying land. He neither inspected the interiors nor measured the dimensions of the buildings. He viewed the buildings only through a fence from adjoining property. We do not think that this transaction is a reliable indicator of FMV.

Furthermore, as mentioned above, Lambert included an entrepreneurial fee of $114,500 under the replacement-cost approach. We believe that such a fee is inappropriate given the depressed economic situation in Lafayette at the time of sale. Lambert himself acknowledged that, as of March 31, 1987, had the land been vacant, it would not have been feasible for an entrepreneur to have constructed buildings of the type on the Property.

Equally troubling in our view are the numerous and substantial alterations Lambert made to the data contained in his report at trial. Among other things, Lambert reduced the estimated value per square foot of Vacant Land Sale No. 3 from $2.45 to $1.89 after acknowledging that he had used the wrong size of the parcel in his initial estimate. For Lease Comparable

No. 6, he reduced the rental rate from $7.02 to $6.24 per square foot. For Lease Comparable No. 7, he lowered the rental rate from $6.63 to $5.62 per square foot. Lambert changed a zero percent adjustment for Improved Sale No. 2 to negative 10 percent to reflect market conditions. For Lease Comparable No. 4, he changed the $5.24 rental figure to $3.28 per square foot. Lambert deleted Lease Comparable No. 9 entirely from his report at trial.

Despite the numerous changes to his data, affecting each of the approaches Lambert used to determine value, Lambert incongruously refused to alter his final estimated FMV for the Property. Under the circumstances, we think this is inappropriate.

B. Petitioners' Experts

Petitioners rely upon the reports and testimony of two certified general real property appraisers, George Parker (Parker) and Rodolfo J. Aguilar (Aguilar), both of whom the parties stipulated are experts. (Prior to trial, respondent filed a motion in limine requesting that the Court not admit into evidence appraisal reports prepared by Monies dated February 16, 1987, and December 1, 1987, as Monies died before trial and therefore could not be cross-examined by respondent as to the factors Monies considered in his valuation of the Property. The Court granted respondent's motion on March 13, 1995.)

Parker relied on the replacement-cost, market-data, and capitalization-of-earnings approaches in appraising the value of the Property at $420,000 as of March 31, 1987. In appraising the Property at $490,000, Aguilar used the replacement-cost and capitalization-of-earnings approaches, but opted against using the market-data approach. Petitioners maintain that their experts have established a reasonable range of values for the Property and that the purchase price of $425,000 falls within that range.

Parker's report was prepared in August 1994. For the replacement-cost approach, Parker estimated the value of the underlying land to be $125,000 (rounded), using 6 vacant land sales as comparables ($1.40 per square foot times 89,380 square feet). He then estimated the 1987 reproduction cost new of the buildings and other improvements at $610,616. Accrued depreciation (incurable physical deterioration and external obsolescence) was estimated at $303,673, for an estimated depreciated cost of the improvements of $306,943. Thus, his estimate of value under this approach was $432,000 (rounded).

For the market-data approach, Parker analyzed 3 sales of automobile agencies in Lafayette. The sales were adjusted to account for physical characteristics. He estimated the value to be $420,000 under this approach.

Finally, using 4 lease comparables (including leases of Improved Sales Nos. 1, 2, and 3 entered into after the purchases

of those properties), Parker valued the Property by capitalizing its earnings. He estimated the Property's net annual operating income to be $51,000 ($3 per square foot rental rate times a gross building area of 16,994 square feet). Using a capitalization rate of 12.2 percent, he valued the Property at $418,000.

After considering all 3 approaches, Parker finally settled on a value for the Property of $420,000.

We think that Parker's report contains several flaws which caused him to value the Property incorrectly. Among other things, Parker neglected to include the 2,510 square-foot paint and body shop in his estimate of annual net operating income under the capitalization-of-earnings approach. Inclusion would necessarily have increased net operating income and, therefore, the FMV of the Property. Furthermore, Parker made no size adjustments for any of the vacant land sales, even though 5 out of the 6 parcels were larger than the Property. We believe that size adjustments should have been made in valuing the Property; Aguilar and Lambert agreed that smaller parcels generally sell for a higher price per square foot than larger parcels. In addition, Parker made no market change and time adjustments for Improved Sale Nos. 2 and 3, which occurred on November 11, 1988, and January 23, 1990, respectively. We conclude that Parker's use of Improved Sales Nos. 2 and 3 without any adjustment for

market change and time under the market-data approach was inappropriate.

Furthermore, Parker viewed Land Sale No. 2 as an arm's-length transaction even though it was actually a sale of an undivided half-interest in property between a mother and daughter.  Transactions between family members are not arm's-length transactions and are subject to special scrutiny.  Harwood v. Commissioner, 82 T.C. 239, 258 (1984), affd. without published opinion 786 F.2d 1174 (9th Cir. 1986); Estate of Whitt v. Commissioner, T.C. Memo. 1983-262, affd. 751 F.2d 1548 (11th Cir. 1985).  Respondent's expert Lambert stated that, as no money was actually transferred between the two parties, it should not be viewed as a comparable sale.  We find Lambert's testimony on this point credible, and we agree with his conclusion.

Finally, Parker deducted $450,000--an amount equal to half of the purchase price--from Land Sale No. 1 for superior market conditions with no explanation as to how he arrived at a deduction of such magnitude.

Petitioner's second expert, Aguilar, prepared his report in October 1991.  For the replacement-cost approach, Aguilar used 6 land sales as comparables, which he then adjusted for size, date of sale, and corner influence.  Aguilar valued the underlying land at $268,167, or $3 per square foot.  Aguilar looked only at land sale comparables as of March 31, 1987; he did not look at sales occurring after that date.  Aguilar then estimated the

reproduction cost new of the improvements using the Marshall Valuation Service. The total, including land value, was $988,973. From that figure, he subtracted accrued depreciation (physical depreciation and external obsolescence) totaling $453,759 to arrive at a value of the subject Property of $535,215.

For the capitalization-of-earnings approach, Aguilar used 3 lease comparables to estimate market rent. Two lease comparables were located in Baton Rouge. One lease comparable was the sublease of 3203 Johnston Street to Courtesy Motors by Mr. Lanier. Aguilar determined a lease rate for the Property of $2.90 per square foot. This resulted in an annual gross operating income of $60,000, given Aguilar's estimation of the Property's gross building area of 20,690 square feet. No expenses were subtracted from this figure since Aguilar assumed a net lease for the Property. Capitalization at a rate of 11.83 percent yielded a value of $507,059 for the Property. From that figure, Aguilar subtracted the estimated cost to remove the 2 underground storage tanks of $50,000 to arrive at a value of $457,000 (rounded).

Aguilar decided against using the market-data approach in part because he concluded that reliable comparable sales data on improved properties was unavailable.

Aguilar's report contains several flaws which preclude us from accepting it in its entirety. Among other things, Aguilar

did not adequately explain the adjustments he made under the replacement-cost approach. Moreover, Aguilar did not make any adjustments for zoning restrictions, flood zone designation, or location. Aguilar claimed that flood zone classifications would affect his estimate of value only if the properties in fact faced a substantial flooding problem. However, we think that a buyer would pay less per square foot for vacant land required to be filled to a certain height before improvements could be constructed, regardless of whether the land actually floods, than for vacant land of similar appeal that does not need to be so filled. In addition, we find it questionable that Aguilar made no location adjustments for any of the 6 vacant land properties despite the fact that the Property was located in a primary commercial corridor, and the comparables were not so situated. Finally, Aguilar included an entrepreneurial fee in his replacement-cost approach which, for reasons discussed earlier, we find inappropriate.

In addition to the above shortcomings, respondent contends that Aguilar's deduction for the cost of removal of the two underground storage tanks under both approaches is in error. We agree with respondent on this point. In taking the deduction, Aguilar (who is a registered environmental property assessor) argued that the underground storage tanks represented a potential risk for a prospective purchaser. Aguilar opined that a would-be buyer would verify that the underground tanks necessary for his

automobile dealership business were installed in accordance with the latest EPA regulations to insure that no leakage or contamination of the soil was possible.  Aguilar based his $50,000 deduction on the cost to remove the tanks in the absence of any contamination of the soil.

We think that such a deduction in this case is not reasonable.  Previously, this Court has stated that it may be appropriate to discount the value of real property for the presence of underground storage tanks, which pose a hazardous waste problem, provided that the amount of the discount is properly quantified.  See Estate of Pillsbury v. Commissioner, T.C. Memo. 1992-425.  In that case, we opined that "The question to be decided is whether a hypothetical buyer * * * with reasonable knowledge of the relevant facts, would have discounted the value of the * * * property".  Id.  We did not sustain a discount for possible contamination because neither the appraiser nor the taxpayer believed further investigation was necessary before stating a value for the property, and no evidence was presented from which such a discount could be determined.

In this case, as a starting point, we look to the Property's highest and best use as a car dealership.  The underground storage tanks (one for gasoline and one for waste oil) are essential to the operation of an automobile dealership on the Property.  There is no evidence that the soil of the Property was contaminated as of March 31, 1987.  Further, Aguilar stated in

taking his deduction he assumed that the Property was not contaminated. In light of no contamination and the needed presence of the tanks, Aguilar has not convinced the Court that a hypothetical buyer with reasonable knowledge of the facts would have discounted the value of the Property due to the presence of the tanks. Therefore, we find Aguilar's deduction for removal of the tanks to be inappropriate. See Estate of Necastro v. Commissioner, T.C. Memo. 1994-352 (where taxpayer failed to prove that a buyer purchasing the property on the valuation date would have perceived the possibility of contamination as a problem causing a reduction in value).

Having carefully reviewed the experts' testimony and appraisal reports, and having accepted none of the experts' reports in their entirety, we must now proceed to determine the FMV of the Property on the facts before us.

For the reasons which follow, we think that the capitalization-of-earnings approach is the most suitable method of valuation in this case. See Honigman v. Commissioner, 55 T.C. 1067 (1971), affd. in part, revd. in part and remanded 466 F.2d 69 (6th Cir. 1972); Gottlieb v. Commissioner, T.C. Memo. 1974-178. No sales of vacant land occurred in the Johnston Street corridor from 1985 through the valuation date, despite being offered. Moreover, at the time of sale, there was a shortage of lending in Lafayette for development. In that connection, the experts all agreed that the highest and best use of the Property,

if it had been vacant land, would have been to leave it for future development.  Thus, the replacement-cost method is unpersuasive in our view.  See Honigman v. Commissioner, supra; Gottlieb v. Commissioner, supra ("We think it unrealistic to determine fair market value by * * * cost of reproduction when such structure would not have been reproduced.").

Furthermore, we agree with Aguilar that the market-data approach is unjustified here.  The sales of improved properties brought to the Court's attention by Lambert and Parker are simply not comparable to the subject Property in our view for the reasons mentioned earlier.

On March 31, 1987, as then improved, the highest and best use of the Property was as an automobile dealership.  Using the capitalization-of-earnings approach, we begin with a gross building area for the Property of 19,504 square feet.  This figure represents the 16,994 square feet used by Parker, plus the 2,510 square-foot paint and body shop that he neglected to include in his analysis.  We next estimate a rental rate for the Property of $3.25 per square foot.  This rate is approximately the same as that for the 3203 Johnston Street property used as a lease comparable by all 3 experts.  3203 Johnston Street was sublet in April 1988 at $36,000 per year with a gross building area of 10,875 square feet, for a rate of $3.31 per square foot. In response to respondent's argument, we do not consider the $10,000-per-month lease rate between the Laniers and Harvey to be

a comparable lease, as it in part reflected the sale of the automobile dealership to Harvey. Nor do we consider the $10,000-per-month lease between the Laniers and the Corporation to be a comparable lease, as it did not represent an arm's-length transaction. See Ingle Coal Corp. v. Commissioner, 174 F.2d 569, 571 (7th Cir. 1949), affg. 10 T.C. 1199 (1948). Our estimated lease rate for the Property incorporates a positive adjustment for location, corner influence, and physical condition, and a slightly greater downward adjustment for size and market condition. This yields a gross annual income of $63,388. No expenses are subtracted from that amount, as we agree with Parker's and Aguilar's assumption of a net lease for the Property. Moreover, we think that a capitalization rate of 12 percent is reasonable. It falls squarely within the range of 11.83 to 12.45 percent determined by the experts. This produces a final estimated FMV for the Property of $528,233.

While the record contains no reference to the exact dollar figure of FMV determined by the Court, it is well settled that

> Valuation * * * is necessarily an approximation * * *.
> It is not necessary that the value arrived at by the
> trial court be a figure as to which there is specific
> testimony, if it is within the range of figures that
> may properly be deduced from the evidence.

Anderson v. Commissioner, 250 F.2d 242, 249 (5th Cir. 1957), affg. in part and remanding for computational matters T.C. Memo. 1956-178; see McGuire v. Commissioner, 44 T.C. 801, 810-811 (1965). That is the situation here.

Having concluded that the FMV of the Property as of the date of sale was $528,233, it follows that the Laniers are in receipt of a constructive dividend in the amount of $103,233 (FMV less purchase price), and we so hold. Secs. 301(c), 316(a); sec. 1.301-1(j), Income Tax Regs.

Finally, we note that Robertson testified that he chose the book value of the Property as the selling price on the Corporation's 1987 return as an "administrative shortcut." Robertson opined

> The difference in the selling price between the book value and the--whatever it actually sold for was put into other income in connection with the sale of the whole business. It had not one penny's effect on taxable income, the bottom line, or the income tax due. Absolutely none.

However, Robertson could not point out where the difference was purportedly taken into income on the Corporation's return. Consequently, petitioners have failed to convince the Court, as is their burden, that the Corporation has already taken into income on its 1987 return the $1,523 difference between the sale price of $425,000 and its adjusted basis in the Property. Rule 142(a). Therefore, we hold that the Corporation must recognize income in the amount of $104,765 (FMV less the Corporation's adjusted basis). Sec. 311(b)(1). The Corporation may apply its 1989 net operating loss of $24,370 in its entirety in order to partially offset its 1987 taxable income. Sec. 172.

II.  Did the Laniers receive a constructive dividend as a result of the Corporation's $13,000 transfer to their son's election campaign committee?

We now turn to whether the Laniers received a constructive dividend in the amount of $13,000 on account of the Corporation's transfer of that sum to Vance E. Lanier, Inc., on September 29, 1987.

Section 61(a)(7) provides that gross income includes dividends.  As mentioned previously, "dividend" is defined in section 316(a) as a distribution of property made by a corporation to its shareholders out of its current and/or accumulated earnings and profits.

It is well established that expenditures made by a corporation for the personal benefit of its shareholders may result in the receipt by the latter of constructive dividends. Nicholls, North, Buse Co. v. Commissioner, 56 T.C. 1225, 1238 (1971); Ashby v. Commissioner, 50 T.C. 409, 417 (1968).  The classification of an expenditure as a constructive dividend is a question of fact.  Hardin v. United States, 461 F.2d 865, 872 (5th Cir. 1972); Lengsfield v. Commissioner, 241 F.2d 508, 510 (5th Cir. 1957), affg. T.C. Memo. 1955-257.  In order to be so classified, the benefit provided by the Corporation must primarily advance the shareholder's personal interest as opposed to the business interests of the corporation.  Ireland v. United States, 621 F.2d 731 (5th Cir. 1980).  However, the mere fact that payments are not deductible by the corporation as a business

expense does not automatically result in constructive dividends to a shareholder.  Ashby v. Commissioner, supra at 418.  The corporation must also have conferred an economic gain or benefit on the shareholder or a member of the shareholder's family as a result of the corporation's transfer, without expectation of repayment.  See United States v. Smith, 418 F.2d 589 (5th Cir. 1969); Falsetti v. Commissioner, 85 T.C. 332, 356-357 (1985); Knott v. Commissioner, 67 T.C. 681, 693-694 (1977); Ellington v. Commissioner, T.C. Memo. 1989-374, affd. 936 F.2d 572 (6th Cir. 1991).  Petitioners bear the burden of proving that respondent's determination of a constructive dividend is erroneous.  Rule 142(a).

In the instant case, the question remaining is whether the payment from the Corporation to the Committee also resulted in a demonstrable economic benefit to Vance, such that a constructive dividend may be imputed to the Laniers.

Respondent argues that because Vance was the only candidate supported by the Committee, he was the only possible beneficiary of the expenditures made by the Committee.  Respondent cites Epstein v Commissioner, 53 T.C. 459 (1969), Johnson v. Commissioner, 74 T.C. 1316 (1980), and Hufnagle v. Commissioner, T.C. Memo. 1986-119, in support of this position.  Conversely, petitioners argue that no economic benefit inured to Vance, as the funds were used to satisfy the obligations of the Committee,

a separate legal entity. Petitioners cite Knott v. Commissioner, supra, in support of their position.

In Epstein v. Commissioner, supra, the stockholders in a corporation established separate trusts for the benefit of their minor children. On the same day, each of the newly created trusts made bargain purchases of real property owned by the corporation. The Court held that the transfers of the property interests from the corporation to the trusts, to the extent of the bargain purchases, were constructive dividends to the stockholders. Id. at 475.

In Johnson v. Commissioner, supra, a stockholder/director of a bank established a trust naming his grandchildren as principal beneficiaries and his wife, son, and daughter-in-law as successive income beneficiaries. Subsequently, the bank procured split-dollar life insurance policies naming the stockholder as the insured and paid the premiums therefor. The proceeds of those insurance policies were payable to the bank to the extent of the net cash value of the policies at the time of the shareholder's death, with the remaining policy proceeds being payable to the trust. This Court found that the shareholder had received an economic benefit from the bank's payment of the premiums on the insurance policies and held that he had received constructive dividends to the extent of such benefit. Id. at 1324.

In <u>Hufnagle v. Commissioner</u>, T.C. Memo. 1986-119, a corporation made payments to three colleges for the educational expenses of the shareholder's children.  Although the children were directors of the corporation at the time, the Court found that the payments were not made for bona fide corporate purposes but were made in satisfaction of parental desires.  We held that the payments constituted constructive dividends to the shareholder, as we found that an economic benefit had inured to the shareholder and his children.

We think that the facts of the cases relied upon by respondent are distinguishable from those before us.  In each of the above cases, demonstrable economic benefits accrued to the shareholders and/or their family members from the transfers of funds by the controlled corporations.  Corporate funds were used to provide for the maintenance, support, or education of the family members, in satisfaction of obligations with which they or the shareholders would otherwise have been saddled.

By contrast, in the instant case, although it is true that expenses for Vance's campaign were paid as a result of the Corporation's contribution, these obligations were the liability of the Committee alone.  Nothing in the record suggests that Vance personally guaranteed these debts.  Robertson insisted upon the corporate form for the Committee precisely because of the limited liability from creditors it offered.

The corporate form is not to be disregarded lightly, and the Court declines to do so here. See Moline Properties, Inc. v. Commissioner, 319 U.S. 436 (1943). We note in this regard that the Committee maintained its own bank account and kept its own accounting and financial records. In addition, the check from the Corporation was endorsed "Vance E. Lanier Inc., Committee to Elect Vance Lanier" rather than by Vance personally, and the funds were deposited in the Committee's own account.

We believe that the facts of Knott v. Commissioner, supra, while not identical to those of the present matter, are nonetheless analogous. In that case, a corporation and its controlled subsidiaries made below-market sales of real estate to its shareholders' eponymous charitable foundation. The shareholders did not receive money or other property from the corporations; their personal debts were not assumed by the corporations; the corporations did not purchase and maintain property for the shareholders' personal use and enjoyment; and the shareholders' family members did not obtain property or other tangible economic benefits as a result of the below-market sales. We held that controlling shareholders or their families must receive property or other economic benefit from the charitable contributions before constructive dividends will be imputed. Id. at 693-694.

While we are aware that the Committee was not a charitable foundation, for our present purposes we think that a political

organization is substantially similar.  The most striking fact in both cases is that, notwithstanding the personal desires of the shareholders, the demonstrable _economic_ benefit of such advances accrued to legally distinct entities, and the distributions in no way satisfied the personal obligations of the shareholders or their families.

Based on the above discussion and in light of all of the evidence in the record, we hold that the Laniers are not in receipt of a constructive dividend as a result of the $13,000 transfer by the Corporation to the Committee.

We have considered all of the other arguments made by the parties, and, to the extent we have not addressed them, find them to be either irrelevant or without merit.

To reflect the foregoing and the issue previously conceded,

Decisions will be entered under Rule 155.